*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 11a0163p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT
—————————

DAVID EUGENE MATTHEWS,

        *Petitioner-Appellant,*

    *v.*

No. 09-5464

PHILIP PARKER, Warden, Kentucky State
Penitentiary,

        *Respondent-Appellee.*

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 99-00091—John G. Heyburn II, District Judge.

Argued: November 30, 2010

Decided and Filed: June 27, 2011

Before: SILER, MOORE, and CLAY, Circuit Judges.

—————————

**COUNSEL**

**ARGUED:** Alan Michael Freedman, MIDWEST CENTER FOR JUSTICE, Evanston, Illinois, for Appellant. Matthew R. Krygiel, OFFICE OF THE KENTUCKY ATTORNEY GENERAL, Frankfort, Kentucky, for Appellee. **ON BRIEF:** Alan Michael Freedman, MIDWEST CENTER FOR JUSTICE, Evanston, Illinois, Susan M. J. Martin, East Brunswick, New Jersey, for Appellant. Matthew R. Krygiel, OFFICE OF THE KENTUCKY ATTORNEY GENERAL, Frankfort, Kentucky, for Appellee.

      CLAY, J., delivered the opinion of the court, in which MOORE, J., joined. SILER, J. (pp. 51–57), delivered a separate opinion concurring in part and dissenting in part.

1

———————————

**OPINION**

———————————

CLAY, Circuit Judge.  Petitioner David Eugene Matthews, who was sentenced to death for murder by the State of Kentucky, appeals the district court's order denying Petitioner's claims and dismissing his petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254.  For the reasons set forth below, we **AFFIRM** in part and **REVERSE** in part.

## BACKGROUND

### I.     Factual Background

On June 29, 1981, Petitioner David Eugene Matthews ("Matthews" or "Petitioner") shot his estranged wife Mary Marlene Matthews ("Marlene"), and his mother-in-law Magdalene Cruse ("Magdalene") with a .22 caliber revolver fired from no more than eighteen inches away.  The murders took place in the house Petitioner had previously shared with his wife before moving out a few weeks prior to the murders.

Petitioner and Marlene had been married for approximately two and a half years before the murders.  Their marriage was tumultuous, and the couple separated often. During these separation periods, Petitioner moved out of the couple's home that they rented from Marlene's family, and moved in with his mother a few blocks away.  The Kentucky Supreme Court found that "[t]hese separations were marked by extreme hostility," *Matthews v. Commonwealth*, 709 S.W.2d 414, 417 (Ky. 1985) ("*Matthews I*"), and Marlene would often yell at Petitioner from across the street.  *See id*.

Marlene also frequently "swore out criminal warrants against [Petitioner] for harassment."  *Id*.  In the five weeks preceding the murders, Marlene swore out two warrants against Petitioner.  One charged Petitioner with sexually abusing Marlene's six-year-old daughter, Petitioner's step-daughter.  The second warrant charged Petitioner with burglary, for breaking and entering into Marlene's residence.  Petitioner was

arrested pursuant to the first warrant, and released under a court order forbidding him from further contacting Marlene. Petitioner was not served with the second warrant until after the murders.

The Matthews and Cruse families also had a tense relationship. Magdalene often called and "harassed" Petitioner's mother, Margaret Laverne Matthews ("Laverne"), on the telephone. Laverne also often told Petitioner fabrications about Marlene's promiscuity in an effort to come between them.

On the evening of June 28, 1981, the night preceding the murders, Petitioner went to a bar with Carol Engel, a woman he had been seeing during the weeks leading up to the crimes, and drank heavily. Petitioner also took Dexedrine and Valium. Additionally, after drinking and taking pills, Petitioner asked Engel to borrow fifty dollars because he wanted to purchase a gun to protect his mother from the Cruse family. Engel lent him the money.

According to the Kentucky Supreme Court, "[i]n the account of the events on the night of the murder given by [Petitioner] to the psychiatrist, [Petitioner] said that he broke into his wife's home at about 1:00 or 2:00 a.m. He found his mother-in-law in bed and shot her" in the head. *Matthews I*, 709 S.W.2d at 417. Petitioner left Magdalene mortally wounded. Magdalene died later that day.

After shooting his mother-in-law, Petitioner "went into the next room, had sexual relations one or two times with his wife, stayed with her until about 6:00 a.m., and shot and killed her." *Id*. According to the evidence presented to the Kentucky trial court through Petitioner's psychiatrist, Petitioner "shot his wife twice because he thought he had missed the first time." *Id*.

The following morning, Lawrence Cruse ("Cruse"), Marlene's father and Magdalene's husband, went to Marlene's home. Cruse found a pocketknife on the steps, and observed that the side door screen had been cut and the glass broken. *See id*. Once inside, he found Magdalene mortally wounded, and Marlene's twice-shot body.

Upon leaving Marlene's house, Petitioner returned to his mother's house. After telling his mother that he had shot Marlene and all of his problems were over, he disposed of the gun in the yard, asked his mother to wash his clothes, took some Valium pills, and went to sleep. The police arrived later that day, and informed Petitioner that he was suspected of murdering Marlene and Magdalene. Petitioner denied his involvement in the murders, but cooperated with the police. The police recovered the gun from Petitioner's mother's house that day, and took Petitioner into custody.

Subsequently, Petitioner was indicted for both murders, and for burglary.

## II.        Procedural History

Petitioner was arrested on June 29, 1981. On August 18, 1981 a grand jury indicted Petitioner for the murders of Mary Marlene Matthews, and Magdalene Cruse, and the burglary of Marlene's home. (*See* App. at 45, Pet. for a Writ of Habeas Corpus.) Petitioner's trial, which was bifurcated into culpability and penalty phases, began in November 1982. The culpability phase lasted four days and resulted in convictions for both murders and the burglary. The penalty phase lasted only one afternoon and resulted in sentences of a term of years for the burglary, and death for each of the murders.

On direct review, Petitioner raised 37 assignments of error. These included, "arguments relat[ing] to the statutory construction and administration of Kentucky's death penalty statute;" "[e]vidence of the burglary warrant and the sexual abuse warrant taken out before the murders should not have been admitted;" "[Petitioner's] presentation of evidence of domestic conflict occurring before the murders took place was unduly limited;" "[t]estimony admitted on cross examination of [Petitioner's] psychiatrist violated the psychologist/patient privilege;" "[t]he evidence did not sustain using the burglary charge as an aggravating factor justifying the death penalty;" "[t]he evidence did not sustain using multiple murders as an aggravating factor justifying the death penalty, and the jury's findings were insufficient on this point;" "use of the word 'recommend' . . . in the court's [death penalty] instructions [to the jury] was error;" "[t]he trial court failed to adequately instruct the jury when the jury inquired about

parole;" and "[t]he trial judge used improper and erroneous considerations in imposing sentence." *Matthews I*, 709 S.W.2d at 418.

Petitioner's direct appeal culminated on September 26, 1985 when the Kentucky Supreme Court affirmed Petitioner's conviction, and rejected all of Petitioner's assignments of error. Although the Kentucky Supreme Court's opinion only analyzed eight issues at length, the court stated that it "considered all of the[] issues [Petitioner raised] . . . . As to those [the Kentucky Supreme Court] d[id] not discuss, [the court] note[d], for the record, that they have been considered and rejected." *Id*. at 417.

In December 1986, Petitioner filed a "Motion to Set Aside, Correct or Vacate Judgment" pursuant to Kentucky Rule of Criminal Procedure 11.42 ("RCr 11.42") in the Jefferson Circuit Court. The Kentucky trial court initially denied Petitioner's RCr 11.42 motion for post-conviction review. *See Matthews v. Commonwealth*, No. 81-CR-0915 (Jefferson Cir. Ct., Aug. 10, 1990). Counsel, however, successfully moved the trial court to reconsider its order. On December 23, 1991, the Kentucky trial court vacated Petitioner's death sentence, finding that the penalty phase jury instruction lessened the jury's sense of moral responsibility for Petitioner's sentence, and was, therefore, defective. (*See* App. at 45, *Matthews v. Commonwealth*, No. 81-CR-0915 (Jefferson Cir. Ct., Dec. 23, 1991) (order vacating death sentence).)

In a new action, the Commonwealth appealed the Kentucky trial court's order vacating Petitioner's death sentence. In this appeal, the Kentucky Supreme Court reversed the trial court's vacatur of Petitioner's death sentence, and ordered the Kentucky trial court to examine all of the issues raised on Petitioner's motion for reconsideration. *See Commonwealth of Ky. v. Hon. Ken Conliffe and David Eugene Matthews*, 92-SC-732-OA (Ky. Dec. 17, 1992) (unpublished). On remand, with a new judge presiding, the trial court denied Petitioner's motion for reconsideration. Petitioner appealed. His motion for reconsideration was first denied on November 20, 1997, and denied again on rehearing on March 19, 1998. *See Matthews v. Commonwealth*, No. 96-SC-805-MR (Ky. Nov. 20, 1997) (unpublished). Petitioner's direct appeal and state

collateral review culminated on October 5, 1998 when the United States Supreme Court denied his petition for a writ of certiorari.

Petitioner filed a petition for a writ of habeas corpus in the district court on February 12, 1999, pursuant to 28 U.S.C. § 2254. In his initial petition, Petitioner raised 46 grounds for relief, several of which had numerous sub-parts. These included several ineffective assistance of counsel claims; claims regarding the jury instructions in the penalty phase; claims regarding improper exclusion of mitigation evidence, and improper inclusion of irrelevant evidence; as well as failure to grant a directed verdict on the murder charges, among others.

On May 7, 1999, Petitioner filed an amended habeas petition, requesting relief on several additional grounds. These included: (1) a claimed *Brady* violation for failing to disclose to the defense that Petitioner was on a powerful anti-psychotic while in jail awaiting trial; (2) that racial animus impermissibly tainted the Kentucky state court proceeding; and (3) that the length of Petitioner's post-sentencing, pre-execution confinement renders capital punishment disproportionate to the offense in violation of the Eighth Amendment. (*See* App. at 341-84, Am. Pet. for a Writ of Habeas Corpus.)

On April 20, 2000, during the pendency of his petition in the district court, Petitioner filed a second RCr 11.42 motion for post-conviction review in Kentucky state court. This RCr 11.42 motion asserted several new claims for relief. In response, the district court dismissed Petitioner's habeas petition on August 1, 2001, for failure to exhaust state court remedies. However, after this Court's decision in *Palmer v. Carleton*, 276 F.3d 777, 781 (6th Cir. 2002) (stating that it "is eminently reasonable" for "a district court [to] dismiss only the unexhausted claims in the habeas petition and stay further proceedings on the remaining portion until the petitioner has exhausted his/her remedies in state court" to avoid "the preclusion of a timely-filed petition for the writ due to the need to accord state courts the opportunity to adjudicate claims"), the district court issued Petitioner a certificate of appealability on the dismissal issue. Petitioner appealed, and we remanded his habeas petition to the district court for further consideration in light of *Palmer*. In the interim, the Kentucky Supreme Court denied

Petitioner's amended RCr 11.42 petition. Petitioner had thus exhausted all available state remedies on all of his claims on remand, and in March and July of 2006 the district court conducted evidentiary hearings on Petitioner's habeas petition. (*See* App. at 630-31, Mem. Op.)

The district court referred Petitioner's habeas petition to a magistrate judge for a report and recommendation. In a 220 page report, the magistrate judge recommended granting Petitioner's habeas petition on two grounds. These were that:

> 1) the trial court[] fail[ed] to grant a directed verdict on the murder counts where the Commonwealth did not prove the absence of extreme emotional disturbance beyond a reasonable doubt, as required by the then-applicable Kentucky murder statute; and 2) appellate counsel fail[ed] to argue on direct appeal that the term 'extreme emotional disturbance' should have been, but was not, defined in the jury instructions in either the guilt or penalty phase of Matthews' trial.

(*Id*. at 410, Rep. and Recommendation.) The district court nevertheless denied Petitioner's habeas petition stating that "[w]hat is required constitutionally are fair procedures and evidence sufficient to warrant the trial's sanction . . . the [district] [c]ourt believes that . . . the Kentucky courts have met these basic requirements of constitutional fairness and justice." (*Id*. at 632, Mem. Op.)

Although the district court denied Petitioner's petition *in toto*, on March 20, 2009, the district court granted Petitioner a certificate of appealability on three grounds. The district court found that reasonable jurists could disagree with its resolution of the claims concerning:

> (1) the trial court's failure to grant a directed verdict on the murder counts based on the Commonwealth's alleged lack of proof on the extreme emotional disturbance element; . . . (2) appellate counsel's alleged ineffectiveness for failing to argue that the term "extreme emotional disturbance" should have been, but was not, defined in the jury instructions in either the guilt or penalty phases of Matthews' trial; . . . [and] (3) Matthews' claim that the prosecutor engaged in prosecutorial misconduct during the closing statements in the guilt phase by denigrating the defense of extreme emotional disturbance thereby denying Matthews a fundamentally fair trial.

(*Id*. at 261, Order Granting Limited Certificate of Appealability.)  The district court stated that "[t]he remainder of the claims presented by Matthews were clear-cut and easily addressed.  The [district] [c]ourt [was] persuaded that reasonable jurists would not debate the correctness of its assessment of these claims."  (*Id*.)

On May 26, 2009, this Court granted Petitioner an expanded certificate of appealability.  As  expanded, the certificate of appealability included: (1) whether Petitioner's trial counsel were ineffective in investigating, preparing and presenting penalty phase evidence; (2) whether Petitioner's trial counsel were ineffective in failing to try to introduce evidence of Petitioner's extreme emotional distress ("EED") in the penalty phase that the trial court had excluded in the culpability phase; (3) whether Petitioner's trial counsel were ineffective in failing to object to the prosecutor's misstatements of the law of EED in both the culpability and penalty phases; (4) whether the trial court's exclusion of additional evidence of Petitioner's EED violated his constitutional rights to present a defense in the culpability phase and a fair and reliable sentence in the penalty phase; (5) whether Kentucky's murder statute was unconstitutionally vague on its face and as applied to Petitioner because EED was neither defined by statute or case law; and (6) whether Petitioner's appellate counsel were ineffective.

Petitioner filed this timely appeal, asserting all of the grounds for relief contained in the expanded certificate of appealability.

## DISCUSSION

### I.    Standards of Review

Petitioner asserts six grounds for habeas relief in the instant appeal: (1) that the state violated clearly established federal law by failing to prove all of the elements of murder as defined under Kentucky law at the time of his trial; (2) prosecutorial misconduct; (3) ineffective assistance of trial counsel; (4) unconstitutional exclusion of mitigation evidence in his trial's penalty phase; (5) that the Kentucky murder statute was unconstitutionally vague; and (6) ineffective assistance of appellate counsel.

In reviewing the district court's decision regarding Petitioner's claims that the state failed to prove all of the elements of murder; prosecutorial misconduct; unconstitutional exclusion of mitigation evidence; and that the Kentucky murder statute was unconstitutionally vague, we review the district court's finding of facts for clear error and questions of law *de novo*. *See Haliym v. Mitchell*, 492 F.3d 680, 689 (6th Cir. 2007); *Campbell v. Coyle*, 260 F.3d 531, 539 (6th Cir. 2001).

However, "[b]ecause an ineffective assistance of counsel claim involves mixed questions of law and fact," *Harries v. Bell*, 417 F.3d 631, 636 (6th Cir. 2005), in reviewing Petitioner's ineffective assistance of trial and appellate counsel grounds for relief, "we review the district court's disposition of the claim *de novo* and its findings of fact for clear error." *Id.*

## II.      Legal Framework

Petitioner filed his petition for a writ of habeas corpus in 1999, after the April 24, 1996 effective date of the Antiterrorism and Effective Death Penalty Act ("AEDPA") amendments to 28 U.S.C. § 2254.  Petitioner's petition is thus governed by AEDPA.

As amended by AEDPA, section 2254(d) states:

> [a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision is "contrary to . . . clearly established federal law" pursuant to section 2254(d)(1) if "the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decided a case differently than the Supreme Court on a set of materially indistinguishable facts." *Lundgren v. Mitchell*, 440 F.3d 754, 762 (6th Cir. 2006) (quoting *Williams v. Taylor*, 529 U.S. 362, 413

(2000)).　A state court decision "involved an unreasonable application of clearly established federal law" pursuant to section 2254(d)(1) if "the state court identifie[d] the correct governing legal principle but unreasonably applies that principle to the facts of the prisoner's case.　Clearly established Federal law, as determined by the Supreme Court of the United States, refers to the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state[]court decision." *Id*. at 763 (quoting *Williams*, 529 U.S. at 412).　Finally, pursuant to AEDPA, "the factual findings of a state court are presumed to be correct and can only be contravened if Petitioner can show by clear and convincing evidence that they are erroneous."　*Id*. (citing 28 U.S.C. § 2254(e)(1)).

### III.　Procedural Default

Prior to addressing the merits of Petitioner's claims, we must determine whether the claims are properly before us, or if they have been procedurally defaulted. Respondent does not contend that Petitioner procedurally defaulted any of the following claims: that the state failed to prove all of the elements of murder; prosecutorial misconduct; ineffective assistance of trial counsel; unconstitutional exclusion of mitigation evidence; and that the Kentucky murder statute was unconstitutionally vague. A respondent failing to raise his procedural default challenge waives it.　*See Baze v. Parker*, 371 F.3d 310, 320 (6th Cir. 2004) ("The state may waive a defense," including procedural default, "by not asserting it.").　Therefore, with respect to these claims, to the extent that Petitioner may have defaulted any of the issues, Respondent has waived its procedural default defense.

Respondent does, however, assert that Petitioner procedurally defaulted his ineffective assistance of appellate counsel claim.　Petitioner raised his ineffective assistance of appellate counsel claim for the first time in his federal habeas corpus petition.　However, by definition, Petitioner could not have raised his ineffective assistance of appellate counsel claim on direct appeal.　Furthermore, according to Kentucky law, Petitioner could not have raised this claim in his state post-conviction motion.　The Kentucky Supreme Court has stated that "claims of ineffective assistance

of appellate counsel . . . cannot be raised in a RCr 11.42 motion." *Taylor v. Commonwealth*, 63 S.W.3d 151, 165 (Ky. 2001). Petitioner's habeas petition was his first opportunity to raise his ineffective assistance of appellate counsel claim, and he did not procedurally default this claim by not previously raising it.

Because we are satisfied that Petitioner did not procedurally default any of his grounds for habeas relief, we will address the merits of his claims.

### IV.    Burden of Proving Extreme Emotional Disturbance

Petitioner argues that the prosecutor failed to prove all of the elements of murder under Kentucky law, and that, therefore, his conviction violated his Fourteenth Amendment due process rights. Petitioner asserts that Kentucky's definition of murder when he committed the crimes at issue included the absence of EED as an element of the crimes, and that the state failed to meet its burden of proof on the EED element. Therefore, Petitioner contends that based on *In re Winship*, 397 U.S. 358 (1970), his conviction "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254.

Under *In re Winship*, in order for a conviction to pass constitutional muster, the state must prove every element of the crime beyond a reasonable doubt. *See In re Winship*, 397 U.S. at 364; *Gall v. Parker*, 231 F.3d 265, 286 (6th Cir. 2000) ("*Gall II*"). Therefore, the inquiries necessary to evaluate this ground for relief are: (1) whether the absence of EED was an element of the crime of murder under Kentucky law in effect at the time of Petitioner's crimes; and (2) if so, whether the state carried its *In re Winship* burden, including proving the EED element beyond a reasonable doubt.

The Kentucky murder statute in effect at the time of the murders stated that a person commits murder when:

> with the intent to cause the death of another person, he causes the death
> of such person or of a third person; except that in any prosecution a
> person shall not be guilty under this subsection if he acted under the
> influence of extreme emotional disturbance, the reasonableness of which

is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be.

Ky. Rev. Stat. § 507.020(1)(a).

In the years preceding Petitioner's crimes, the Kentucky Supreme Court reiterated on numerous occasions that, "the failure to act under the influence of extreme emotional disturbance is an element of the offense of murder." *Edmonds v. Commonwealth*, 586 S.W.2d 24, 27 (Ky. 1979); *see also Bartrug v. Commonwealth*, 568 S.W.2d 925, 926 (Ky. 1978) ("[T]he statute makes the absence of extreme emotional disturbance an essential element of the offense of murder." The Kentucky "legislature clearly intended the prosecution to bear the risk of non-persuasion on the element of mitigation."); *Ratliff v. Commonwealth*, 576 S.W.2d 307, 309 (Ky. 1978) ("[T]he prosecution carried the burden to satisfy the jury of the absence of extreme emotional disturbance."). In June of 1981 when Petitioner committed the crimes at issue, Kentucky law defined the absence of EED as an element of murder.

During the months preceding Petitioner's crimes, the Kentucky Supreme Court refined the distribution of the burden of proving the EED element. In *Gall v. Commonwealth*, 607 S.W.2d 97, 108-09 (Ky. 1980) ("*Gall I*"), the Kentucky Supreme Court stated that "[t]he Commonwealth bore the burden of proof" on the EED element, but "[a]n instruction of murder need not require the jury to find that the defendant was not acting under the influence of extreme emotional disturbance unless there is something in the evidence to suggest that he was, thereby affording room for a reasonable doubt in that respect." *See also Smith v. Commonwealth*, 599 S.W.2d 900, 905 (Ky. 1980). Thus, after *Gall I*, the burden of proving the EED element was distributed between the parties. The defendant bore the initial burden of production required to trigger the inclusion of the EED element as an element of the crime. Once the defendant satisfied its burden of production and "raised a reasonable doubt" regarding the EED element, the state bore the ultimate burden of persuasion, and was required to prove the EED element beyond a reasonable doubt.

In the years following Petitioner's crimes, the Kentucky Supreme Court redistributed the burden of proving EED, and placed it entirely on the defendant. In *Wellman v. Commonwealth*, 694 S.W.2d 696 (Ky. 1985), decided four years after Petitioner's crimes, the Kentucky Supreme Court stated that "[t]he presence or absence of extreme emotional distress is a matter of evidence, not an element of the crime." *Id.* at 697. To dispel any ambiguity, the Kentucky Supreme Court further declared that "[t]o the extent that . . . cases declare absence of extreme emotional distress to be an element of the crime of murder, they are expressly overruled." *Id.*

*Wellman* was the law when the Kentucky Supreme Court decided Petitioner's direct appeal. However, because *Gall I* was the law when Petitioner committed the crimes, the Kentucky Supreme Court was constitutionally required to apply *Gall I* to Petitioner's case. As the Supreme Court stated in *Bouie v. City of Columbia*, 378 U.S. 347, 353-54 (1964) (internal quotations and citations omitted),

> an unforeseeable judicial enlargement of a criminal statute, applied retroactively, operates precisely like an *ex post facto* law, such as Art. I, § 10, of the Constitution forbids . . . . The fundamental principle that the required criminal law must have existed when the conduct in issue occurred, must apply to bar retroactive criminal prohibitions emanating from courts as well as from legislatures. If a judicial construction of a criminal statute is unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue it must not be given retroactive effect.[1]

According to *Bouie*, it is impermissible for a court to apply a new judicial construction of the criminal law to prior crimes.

In *Gall II*, 231 F.3d at 305-06, we analyzed the constitutionality of applying the post-*Wellman* understanding of parties' EED burdens to earlier conduct, and applied

---

[1] The Supreme Court's decision in *Rogers v. Tennessee*, 532 U.S. 451 (2001), upholding the Tennessee Supreme Court's overruling of its common law "year-and-a-day" murder rule and its application of that decision to the case before it, clarified that *Bouie* was not coextensive with the *ex post facto* clause. This does not alter the analysis in Petitioner's case. *Rogers* stated that the foreseeability of the Tennessee Supreme Court's abolition of the "year-and-a-day" rule played a significant role in its decision. *See id.* at 462-67. Moreover, the Supreme Court explicitly upheld *Bouie* and explained that *Bouie* "was rooted firmly in well established notions of due process. Its rationale rested on core due process concepts of notice, foreseeability, and, in particular, the right to fair warning as those concepts bear on the constitutionality of attaching criminal penalties to what previously had been innocent conduct." *Id.* at 459.

*Bouie* to a materially indistinguishable case. We explained that although the Kentucky Supreme Court's later cases discussing EED "held that absence of EED was not an element of murder," under *Bouie*, "the Kentucky Supreme Court's explicit alterations of its interpretation of EED in cases such as *Wellman* . . . [may] not be applied to" preceding conduct. *Id*. at 305.

*Bouie* prohibits retroactive application of *Wellman*, as *Wellman* was not a conclusion that was foreseeable at the time of Petitioner's crimes. As we explained in *Gall II*, "[u]nder the most reasonable reading of the statute's plain text . . . absence of EED was an element of the crime." *Id*. Moreover, "[b]eyond the statute itself, [the] Kentucky Supreme Court's earliest interpretations of the statute, its decision to apply this reading retroactively to cases that occurred shortly after the statute came into effect . . . and its explicit acknowledgment that the later cases were directly overruling the prior cases, all support this view." *Id.* at 305-06. Finally, application of the Kentucky Supreme Court's later formulation of the EED burden to crimes previously committed contravenes *Bouie* as "[i]t is also clear that the retroactive application of those cases would substantially disadvantage [a defendant], both by removing an element of murder, and by making [the defendant's] burden of showing EED substantially more difficult." *Id*. at 306. Thus, at Petitioner's trial, if Petitioner raised a reasonable doubt regarding the EED element, the state bore the burden of establishing the EED element beyond a reasonable doubt.

Notwithstanding that *Gall I* was the law at the time of Petitioner's crimes, the Kentucky Supreme Court nevertheless applied the new *Wellman* formulation of its murder statute to uphold Petitioner's conviction on direct appeal. *See Matthews I*, 709 S.W.2d at 421 ("We have recently written on this subject in *Wellman v. Commonwealth* . . . clarifying that the absence of extreme emotional disturbance is not an element of the crime of murder which the Commonwealth must affirmatively prove. The trial court's instructions in regard to extreme emotional disturbance were adequate, and the proof supported the jury's findings of intentional murder."). However, because the Kentucky Supreme Court's decisions subsequent to Petitioner's crimes cannot constitutionally

govern the disposition of Petitioner's appeal, Petitioner's murder conviction can only be upheld if the state proved the elements of murder, as defined by *Gall I*, beyond a reasonable doubt.

As we explained above, under *Gall I*, EED was only an element of murder if the defendant raised a reasonable doubt as to its presence. Therefore, the defendant had the initial burden of production. Once the defendant met this burden, the burden shifted, requiring the state to prove the EED element beyond a reasonable doubt. *See Gall I*, 607 S.W.2d at 108-09. Therefore, once Petitioner presented sufficient evidence demonstrating his EED to carry his burden of going forward, the prosecution was required to demonstrate the absence of EED beyond a reasonable doubt to convict Petitioner of murder.[2] Convicting Petitioner of murder when the prosecution failed to prove the EED element beyond a reasonable doubt, contravened the Supreme Court's established precedent requiring the state to prove every element of a crime beyond a reasonable doubt. *See In re Winship*, 397 U.S. at 364.

In this case, we look to Kentucky's substantive treatment of EED to determine whether Petitioner met his production burden, and triggered EED's inclusion as an element of murder. At the time of the murders, the Kentucky statute did not clearly define EED. However, under Kentucky law at the time of Petitioner's crimes, "a mental

---

[2]We emphasize that contrary to the dissent's characterization, EED was not an affirmative defense at the time of Petitioner's crimes. *See Gall II*, 231 F.3d at 288-90. Rather, the absence of EED was an element of murder. *See id.* Had EED been an affirmative defense, Petitioner would have borne the burden of proof. However, because the absence of EED was an element of murder, the prosecution was required to prove the EED element beyond a reasonable doubt. *Id.* at 294-96. The dissent cites several Kentucky cases to support the contention that the prosecution sufficiently rebutted Petitioner's evidence of EED. These cases are of limited relevance because they effectively shifted the burden of proof to the defendant. *See id.* at 294-95. In reviewing the evidence with respect to EED, *Hayes v. Commonwealth*, 625 S.W.2d 583, 585-86 (Ky. 1981) imposed the same burden of production on the defendant found to be "constitutionally infirm" by this court in *Gall II*. *Compare Gall II*, 231 F.3d at 296 (holding that due process was violated by *Gall I* regime whereby prosecution need not rebut evidence of EED unless defendant offers evidence "of such probative force" that he "would be entitled as a matter of law to an acquittal") (internal quotation marks omitted) *with Hayes*, 625 S.W.2d at 585-86 (Ky. 1981) (applying *Gall I* to hold that "evidence of emotional disturbance was not so substantial as to mandate a directed verdict of acquittal"). *Ice v. Commonwealth*, 667 S.W.2d 671, 678 (Ky. 1984), and *Newsome v. Commonwealth*, 366 S.W.2d 174, 175 (Ky. 1962), reviewed whether, as a matter of law, the defendant had proved the affirmative defense of insanity. *See Ice*, 667 S.W.2d at 678 ("[T]he introduction of proof of insanity by defendant does not place a burden on the Commonwealth to prove him sane.") (internal quotation marks omitted); *Newsome*, 366 S.W.2d at 175 (assessing strength of defendant's evidence when "defense at . . . trial was insanity"). These cases, in which the defendants bore a high burden, shed little light on whether the prosecution carried its burden on the EED element in Petitioner's case.

disorder, whether or not it amounts to legal insanity, may constitute a reasonable explanation or excuse for extreme emotional disturbance." *Gall I*, 607 S.W.2d at 109; s*ee also Gall II*, 231 F.3d at 302.

For EED to be included as an element of murder, Petitioner had to introduce sufficient evidence, which could include evidence of a mental disorder, to raise a reasonable doubt regarding whether he was under the influence of EED when he committed the crimes. *See Gall I*, 607 S.W.2d at 108-09. At trial, Dr. Lee Chutkow, the psychiatrist who evaluated and diagnosed Petitioner in advance of trial, testified that Petitioner suffered from an adjustment disorder and alcohol abuse. (*See* App. at 1196, Trial Tr.) An adjustment disorder, explained Dr. Chutkow, is a "temporary emotional and behavioral disturbance" in individuals "subject to a variety of stresses, either psychological, social, physical, or a combination of stresses for days, weeks or months." (*Id*.) Symptoms of an adjustment disorder can include impaired judgment and self control, as well as attempts to hurt others. (*See id*.) On redirect examination, Petitioner's counsel asked Dr. Chutkow whether he was "able to formulate an opinion as to whether at the time of the offenses on June the 29, 1981 . . . [Petitioner's] mental state . . . amounted to an extreme emotional disturbance or not?" Dr. Chutkow replied, "Yes. He was developing for several weeks, I believe, progressively, extreme tension, irritability, and almost a kind of fear of his late wife." (*Id*. at 1205.)

The Kentucky Supreme Court applied the relevant definition of EED to determine that several defendants were operating under EED. However, these defendants often suffered from more serious conditions than did Petitioner, including mental disorders akin to paranoid schizophrenia. *See, e.g., Ratliff*, 567 S.W.2d at 309; *Gall I*, 607 S.W.2d at 109; *Edmonds*, 586 S.W.2d at 26. Nevertheless, through Dr. Chutkow's testimony, Petitioner presented evidence that Petitioner was suffering from a mental condition in the form of EED. Dr. Chutkow's testimony raised a reasonable doubt regarding the EED element, and shifted onto the state the burden of proving the EED element beyond a reasonable doubt. The constitutionality of Petitioner's conviction thus rests on whether the state met this burden of proof.

In general, to determine whether the prosecution carried its burden on an element of a crime we ask "whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).[3] In the instant case, we must determine whether "any rational trier of fact" could have found that the prosecution proved the EED element beyond a reasonable doubt.

The prosecution presented no evidence of its own regarding the EED element. Moreover, in cross-examining Dr. Chutkow, the prosecution only elicited further statements supporting Petitioner's EED at the time of the crimes. For example, when the prosecution asked Dr. Chutkow whether he had testified that Petitioner "was suffering from some extreme emotional disturbance at the time," Dr. Chutkow replied "Yes." (App. at 1219-20, Trial Tr.)

Under Kentucky law, the prosecution was not required to present direct evidence regarding a defendant's mental state in order to sustain its burden of proof on the EED element. *See Gall I*, 607 S.W.2d at 109. However, because Petitioner satisfied his burden of going forward with respect to the EED element, and the prosecution neither undermined nor contravened Petitioner's EED evidence, there remained a reasonable doubt regarding the EED element. Therefore, no rational trier of fact could have found beyond a reasonable doubt that Petitioner acted in the absence of EED, and convicting Petitioner violated the requirements articulated in *In re Winship*.[4]

---

[3]Although Petitioner formulates this ground for habeas relief as a failure to direct a verdict in his favor, this formulation is materially identical to a sufficiency of the evidence analysis. *Compare Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky. 1991) ("On motion for directed verdict, the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given.") *with Jackson*, 443 U.S. at 319 (reviewing a verdict for sufficiency of the evidence a court must ask "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."). Both sufficiency of the evidence, and directed verdict analyses scrutinize whether any rational trier of fact would find the element in question beyond a reasonable doubt. The only difference between the two inquiries is the timing of the court's evidentiary review. Whereas a directed verdict motion is made either at the close of the prosecution's case, or at the close of all evidence, a sufficiency of the evidence review occurs on appeal.

[4]The dissent relies on the Kentucky Supreme Court's finding that the prosecution rebutted Petitioner's EED evidence sufficiently to present the issue to the trial jury because "[i]n addition to the circumstances of the crime . . . when [Petitioner] returned to his mother's house after the crime . . . he took

Accordingly, the Kentucky courts violated clearly established federal law as articulated by the United States Supreme Court in *In re Winship* by shifting the burden of proving the EED element onto Petitioner. At the time of Petitioner's crimes, the absence of EED was an element of murder under Kentucky law; however, the state failed to prove the EED element beyond a reasonable doubt. We therefore grant Petitioner a writ of habeas corpus on this ground.[5]

### V.     Prosecutorial Misconduct

Petitioner argues that the prosecutor's improper denigration of Petitioner's EED defense in his closing argument undercut the integrity of Petitioner's trial, and violated the due process clause of the Fourteenth Amendment.

In his closing arguments the prosecutor stated, "[Petitioner is] covering up, Ladies and Gentlemen, because he himself does not believe that . . . any disorder he might have are his reasons for murdering his wife and mother-in-law. They aren't

---

steps to hide the gun and clean his clothes. Shortly thereafter, he gave a false statement to the police." *Matthews I*, 709 S.W.2d at 421.

    However, during Petitioner's trial Dr. Chutkow explained that the nature of Petitioner's EED was such that Petitioner had a warped perception of the need to commit the crimes. However, Petitioner's understanding that his actions were criminal, and that it was in his best interest to minimize evidence connecting him to the crimes, were unaffected by his EED.

    Petitioner's counsel asked Dr. Chutkow whether Petitioner's EED "[w]ould comport with his . . . perhaps hiding the gun or making a false statement? . . . [W]ould either his putting the gun away or . . . giving a false statement, would either of those stand for the proposition that the [EED] diagnosis that you have given just completely do[esn't] exist?" (App. at 1209, Trial Tr.) Dr. Chutkow replied, "[n]o, the diagnosis still exists, because [Petitioner] knew what the action was. His interpretation of his motives about the action or the need to do this or the purpose of doing it . . . was quite unrealistic, but he knew what he was doing . . . was wrong in a legal sense." (*Id*. at 1209-10.) Dr. Chutkow reaffirmed this position on cross-examination. (*See id*. at 1220.)

[5]Petitioner also argues in the alternative that under Kentucky law in effect at the time of the crimes, "[u]nless the evidence raising the issue [of EED] is of such probative force that otherwise the defendant would be entitled as a matter of law to an acquittal on the higher charge (murder), the prosecution is not required to come forth with negating evidence in order to sustain its burden of proof." *Gall I*, 607 S.W.2d at 109. In other words, Petitioner further argues that constitutionally, his burden of production on the EED element should have been satisfied when he raised a reasonable doubt regarding the EED element. Nevertheless, Kentucky law required him to prove the EED element beyond a reasonable doubt in order to meet his burden of production.

    We have found that requiring a defendant to bear the heavy burden of disproving an element of a crime beyond a reasonable doubt is "exactly the type of burden-shifting proscribed by [the Supreme Court in] *Mullaney*." *Gall II*, 231 F.3d at 295. *See Mullaney v. Wilber*, 421 U.S. 684 (1975). In *Gall II* we explained that the Supreme Court stated in *Mullaney* "that the proof of an element that distinguishes between murder and manslaughter implicates *In re Winship* as much as an element that distinguishes guilt from innocence." *Id*. Therefore, "requiring a defendant to offer evidence of such probative force that otherwise he would be entitled as a matter of law to an acquittal . . . violated due process." *Id*. (citing *In re Winship*, 397 U.S. at 364.)

reasonable. Nobody's going to believe that's a reason." (App. at 1309, Trial Tr.) The prosecutor elaborated:

> [Petitioner] is arraigned, he meets his attorney and either he tells his attorney, I did it or I didn't do it. One way or the other. But the attorney knows what the evidence is. By the way, the defendant knows what the evidence is, because while he's giving this statement, it's sitting forth right in front of him at the Homicide Office. Here's the gun. Here's the shoes, David. "Nah, nah, I never saw it before, I never borrowed a gun. I never borrowed any money. I wasn't there. I was at home in bed asleep." He's denying it there. And what does his attorney think? His attorney sees all this evidence, and he's going through his mind, what kind of legal excuse can I have? What's the man's defense? Self protection? No, there's no proof of a gun found at that house on 310 Lytle Street. Protection of another? The defendant's mother is at home on Lytle Street. He isn't protecting her over there on North 24th Street. Intoxication? Yeah, well, he was drinking that night. Maybe that will mean something. But that isn't enough Ladies and Gentlemen. Mr. Busse has to contact a psychiatrist to see his client, and he comes in and sees his client one month after the day of his arrest, one month to the day, and by that time, Mr. David Eugene Matthews sees his defense in the form of Doctor Chutkow, and do you think this guy is aware of what's going on? He's competent, he can work with his attorneys, and he enhances his story to Doctor Chutkow. Yeah, I was drinking. I was drinking a lot. I was taking a lot of pills, too, and let me tell you about the pills I was taking. Don't you think he has a purpose in enhancing his story to the psychiatrist? Don't you think he would exaggerate his fears about his wife, his mother-in-law, and all these other things about what other people might be doing to his mother? Don't you think he would overstate the extent of his intoxication to his psychiatrist? It's the defense of last resort, Ladies and Gentlemen. He has no excuse for his conduct, but that's his only way out.

(*Id*. at 1309-11.)

In reviewing a petition for habeas corpus based on prosecutorial misconduct, "the relevant question is whether the prosecutor's comments so infected the trial with unfairness as to make the conviction a denial of due process." *Lundgren*, 440 F.3d at 778 (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)). This Court engages in a two step inquiry to determine whether the prosecutorial misconduct rises to the level of unconstitutionality. "To satisfy the standard for prosecutorial misconduct, the conduct

must be both improper and flagrant." *Broom v. Mitchell*, 441 F.3d 392, 412 (6th Cir. 2006).

Our prior decisions dealing with prosecutorial misconduct provide some guidance regarding the nature of improper prosecutorial conduct.

> In determining whether the [prosecutor's] statements . . . were proper, there are several guidelines available. First, advocates have an obligation to put forth only proper arguments based on the evidence in the record. Also they must obey the cardinal rule that a prosecutor cannot make statements calculated to incite the passions and prejudices of the jurors. Finally, [this Court] h[as] held . . . that a prosecutor may not make improper comments designed to completely undercut the defendant's sole mitigation theory, effectively denying him fair jury consideration.

*Id*.

In *Gall*, "[r]ather than attacking Gall's insanity evidence by pointing to counter-evidence that Gall was sane, the Commonwealth simply assaulted the very use of the defense." *Gall II*, 231 F.3d at 314. The prosecutor in *Gall* called Gall's insanity defense "the last line of defense." *Id*. The prosecutor also stated that "Gall is legally feigning insanity," and "reminded the jury not to be hoodwinked into the defense of insanity." *Id*. at 313-14. We "ha[d] no doubt that these tactics were improper," in *Gall*. *Id.* at 315.

The prosecutor's denigrating statements in *Gall* were more pervasive than those of the prosecutor in this case. Indeed, we found in *Gall II* that "[t]hese comments and misrepresentations comprised part of a broader strategy of improperly attacking Gall's insanity defense." *Id*. at 313. Nevertheless, the prosecutor's comments in this case are sufficiently similar to those in *Gall* that they rise to the level of impropriety. The prosecutor in Petitioner's trial likewise did not point to any substantive evidence rebutting Petitioner's EED claim. Instead, he cast aspersions on Petitioner's EED claim by suggesting collusion between Petitioner, his attorney, and his psychiatrist, stating that Petitioner was "competent," could "work with his attorneys," and saw "his defense in the form of Doctor Chutkow." (App. at 1310-11, Trial Tr.) Therefore, the prosecutor suggested that Petitioner "enhance[d] his story to Doctor Chutkow," to manufacture his

EED defense. (*Id*.) The prosecutor also denigrated the EED defense itself stating, "[i]t's the defense of last resort, Ladies and Gentlemen. He has no excuse for his conduct, but that's his only way out." *(Id*.)

Although "a prosecutor may not make improper comments designed to completely undercut the defendant's sole mitigation theory, effectively denying him fair jury consideration," *Broom*, 441 F.3d at 412, that is precisely what the prosecutor did in Petitioner's trial. Thus the prosecutor's conduct was improper, satisfying the first prong of the prosecutorial misconduct test.

Regarding the second, flagrancy, factor of the prosecutorial misconduct test we have stated:

> [o]nce conduct is held to be improper, there are four factors [to] consider in determining flagrancy: (1) the likelihood that the remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) the total strength of the evidence against the [petitioner].

*Id*. Application of these factors demonstrates that the prosecutor's conduct in Petitioner's trial was flagrant, depriving Petitioner of a constitutionally proper trial.

First, the prosecutor's statements were likely to mislead the jury. A prosecutor,

> [m]isrepresenting facts in evidence . . . may profoundly impress a jury and may have a significant impact on a jury's deliberations. This is particularly true in the case of prosecutorial misrepresentation because a jury generally has confidence that the prosecuting attorney is faithfully observing his obligation as a representative of a sovereignty, whose interest in a criminal prosecution is not that it shall win a case, but that justice will be done.

*Gall*, 231 F.3d at 313. In light of the weight that juries accord a prosecutor's statements, there is a significant danger that Petitioner's jury seriously considered the prosecutor's allegations that Petitioner was exaggerating the extent of his EED, and colluding with his attorney and doctor to manufacture his EED defense.

The next element of the flagrancy inquiry is, "whether the remarks were isolated or extensive." *Broom*, 441 F.3d 412. In this case, in contrast to *Gall* where the prosecutor's denigration of Gall's insanity defense was "part of a broader strategy," *Gall II*, 231 F.3d at 313, the prosecution's improper statements were confined to his closing arguments. However, the remarks, which spanned two pages of the trial transcript, and comprised nearly a quarter of his closing statement, were hardly isolated.

The third factor is, "whether the remarks were deliberately or accidentally made." *Broom*, 441 F.3d 412. There is no direct evidence regarding intent. However, when "the prosecutor[] . . . opts to select inappropriate arguments and use them repeatedly during summation . . . [t]he intentionality of the prosecutor's improper remarks can be inferred from their strategic use." *Bates v. Bell*, 402 F.3d 635, 648 (6th Cir. 2005). In this case, the prosecutor presented a lengthy narrative to the jury detailing his theory of Petitioner's exaggeration and collusion. This suggests that the prosecutor deliberately presented the improper arguments.

Finally, we must consider "the total strength of the evidence against the [petitioner]." *Broom*, 441 F.3d at 412. In assessing the "total strength of the evidence against [Petitioner], [this Court] must distinguish between evidence of the [Petitioner's] guilt of the underlying criminal charge and evidence of any . . . mitigating circumstances." *Id.* at 413. The only issue considered in Petitioner's trial was whether or not he killed his wife and mother-in-law under the influence of EED. Actual innocence was not an issue. As previously discussed, the prosecution presented no evidence rebutting Petitioner's demonstration that he was acting under the influence of EED while committing the crimes. The strength of the evidence available to rebut Petitioner's EED defense was dubious. Therefore, the fourth factor suggests that the prosecutor's statements satisfy the flagrancy requirement set by this Court.

The prosecutor's comments during closing arguments regarding Petitioner's supposed exaggeration of his EED, and collusion with his attorney and doctor, were both improper and flagrant. "[T]he Commonwealth's misconduct was sufficiently egregious to render the entire trial fundamentally unfair." *Gall II*, 231 F.3d at 315.

Accordingly, the prosecution's statements suggesting that Petitioner and his defense team colluded to manufacture his EED claim, and exaggerated the extent of his EED, rendered Petitioner's trial unfair, and denied him of his constitutionally protected due process rights. It was unreasonable for the Kentucky Supreme Court to reach a contrary result.

## VI.     **Ineffective Assistance of Trial Counsel**

In *Strickland v. Washington*, 466 U.S. 668, 687 (1984), the Supreme Court stated that "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Thus, to prevail on an ineffective assistance of counsel claim, a petitioner "must demonstrate that counsel's representation fell below an objective standard of reasonableness and that the [petitioner] was prejudiced by the ineffective assistance of counsel." *Carter v. Bell*, 218 F.3d 581, 591 (6th Cir. 2000) (citing *Strickland*, 466 U.S. at 687). "Representation is deficient," under the *Strickland* test, "when counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment." *Id.* Moreover, to satisfy the prejudice prong of *Strickland*, a petitioner "need not show that counsel's deficient conduct more likely than not altered the outcome in the case, rather, only that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Lundgren*, 440 F.3d at 770 (citing *Strickland*, 466 U.S. at 494). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 799.

*Strickland*'s prejudice prong is further refined in the context of a death sentence. "When a petitioner challenges a death sentence, the question is whether there is a reasonable probability that, absent the errors, the sentencer – including an appellate court, to the extent it independently reweighs the evidence – would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Harries*, 417 F.3d at 637 (internal quotations omitted). Furthermore, "[u]nder federal law, one juror may prevent the death penalty by finding that mitigating factors outweigh

aggravating factors . . . . [Therefore,] the prejudice prong is satisfied if there is a reasonable probability that at least one juror would have struck a different balance." *Lundgren*, 440 F.3d at 770 (quoting *Wiggins v. Smith*, 539 U.S. 510, 523-28 (2003)).

## 1. Ineffective Assistance of Trial Counsel in Investigation, Preparation and Presentation of Penalty Phase Evidence

Petitioner argues that trial counsel were ineffective for: (1) failing to adequately diagnose and demonstrate the severity of Petitioner's EED and mental health conditions; (2) failing to investigate, discover and present a variety of mitigating facts relating to both Petitioner's and his family's histories, to wit, evidence of mental illness in Petitioner's family; alcoholism in Petitioner's family; Petitioner's own alcohol and drug abuse, which indicated a possibility of brain damage; and vast amount of non-statutory mitigating evidence relevant to Petitioner's upbringing and character. (*See* App. at 456, Rep. and Recommendation.)

Petitioner further claims that "[c]ounsel were also ineffective in failing to try to present [additional mitigation] testimony in the penalty phase . . . even though the trial judge had excluded the same testimony in the culpability phase." (Br. of Pet'r at 41.) Petitioner argues that because "[m]itigation must be offered to the jury[,] counsel ha[d] a duty to present it," and that, "[o]pting not to try to represent this evidence . . . amounted to deficient performance." (*Id*. at 42.)

"The Eighth and Fourteenth Amendments to the United States Constitution dictate that the sentencer in a capital case may not be precluded from considering any relevant circumstances as a mitigating factor." *Carter*, 218 F.3d at 594 (citing *Mills v. Maryland*, 486 U.S. 367 (1988)). Evidence appropriate for admission as "[m]itigating evidence includes any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Id*. (quoting *Lockett v. Ohio*, 438 U.S. 586, 604 (1978)) (internal quotation marks omitted).

We have, therefore, emphasized that "a thorough and complete mitigation investigation is absolutely necessary in capital cases." *Dickerson v. Bagley*, 453 F.3d 690, 693 (6th Cir. 2006). "Capital defense counsel has an affirmative duty to pursue mitigation evidence and to conduct an appropriate investigation into potential mitigating factors." *Lundgren*, 440 F.3d at 770. As such, "investigations into mitigating evidence should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." *Id.* at 771 (internal quotations and citations omitted).

Because "it is undisputed that [a] petitioner has a right – indeed, a constitutionally protected right – to provide the jury with . . . mitigating evidence," *Carter*, 218 F.3d at 594, and because the extent of admissible mitigation evidence is sweeping, "notwithstanding the deference *Strickland* requires, neither this [C]ourt nor the Supreme Court has hesitated to deem deficient counsel's failure to fulfill this obligation." *Harries*, 417 F.3d at 637.

### a.          Evidence of Petitioner's EED and Mental Health

In the instant appeal of his petition for a writ of habeas corpus, Petitioner asserts that his trial counsel were ineffective in preparing Dr. Lee Chutkow, the psychologist who evaluated Petitioner and testified at trial. Due to counsel's deficiencies, Petitioner argues, Dr. Chutkow's diagnosis did not reflect the seriousness of Petitioner's mental disorders, and Petitioner was prejudiced during the mitigation phase of trial.

To assess Petitioner's mental health, Petitioner's trial counsel hired both a psychiatrist and a neuropsychologist to evaluate Petitioner in advance of trial. Only Dr. Chutkow, the psychiatrist, provided a relevant diagnosis. Dr. Chutkow met with Petitioner several times to question Petitioner about his personal history, and his relationship with his wife and family. Dr. Chutkow also spoke with Petitioner's mother. Based on these evaluations, Dr. Chutkow diagnosed Petitioner with adjustment disorder and alcohol abuse. (*See* App. at 467-68, Rep. and Recommendation.)

Petitioner's habeas counsel hired a psychologist, Robert Smith, Ph.D., to evaluate Petitioner's mental health, and to assess the reliability of Dr. Chutkow's diagnosis which was presented at Petitioner's trial. (*See id.* at 3709-808, Tr. of Hr'g 7/19/2006.) At an evidentiary hearing held before the magistrate judge on July 19, 2006, Petitioner's habeas counsel questioned Dr. Smith regarding the sufficiency of Dr. Chutkow's examination and diagnosis. Dr. Smith explained that in his professional opinion, in diagnosing Petitioner it was important to identify "corroborating data regarding the characteristics of an individual's behavior and use of alcohol and other drugs to confirm the information that's provided by David Matthews." (*Id.* at 3719.) The diagnosing psychologist in Petitioner's case was tasked with "trying to determine if information from the defendant is reliable, what you look for are consistencies . . . what you are looking for is overlaps . . . recognizing that that data then is likely to be valid and reliable." (*Id.* at 3720.) Therefore, explained Dr. Smith, "the important thing in reaching a diagnosis would be to have [family] history because historical data becomes very important about the progression of a disorder; family history, because again, genetic influences can be important." (*Id.* at 3719.) Dr. Smith concluded that "[he] did not believe that Dr. Chutkow's diagnosis was reliable," (*id.* at 3717), because "the material that [Dr. Chutkow] had was limited. He did not have information from family. He did not do a detailed history of David Matthews' use of alcohol and other drugs beginning in childhood through adolescence and into adulthood. So as a result, he didn't have the information to make a reliable diagnosis." (*Id.* at 3717-18.)

In reaching his own diagnosis, Dr. Smith

did a full history of David Matthews' family, asking about each family member who may have used or abused alcohol or other drugs. Then went through his entire life. Asking about his use of different substances at different times, looking for patterns of use, and looking for any indications of progression. Then looked at his testing results . . . from . . . Dr. Chutkow, medical records for David Matthews and family members. Affidavits of family members and friends, and a number of court documents.

(*Id*. at 3718-19.) Based on these inquiries, Dr. Smith "made two primary" diagnoses regarding Petitioner's condition at the time of the crimes. (*See id*. at 3721.) He diagnosed Petitioner with "substance dependence, alcohol dependence, [and] amphetamine abuse," as well as "narcissistic personality disorder." (*Id*.) Petitioner contends that Dr. Smith's more severe diagnoses are more accurate reflections of Petitioner's mental health at the time of the crimes than were Dr. Chutkow's.

Although Dr. Smith testified before the magistrate judge regarding the inadequacies of Dr. Chutkow's diagnosis and trial testimony, (*see id*. at 3717-21, Tr. of Hr'g 7/19/2006), in his deposition, Mr. Busse, one of Petitioner's trial counsel, stated that contrary to Dr. Smith's assertion, "Dr. Chutkow did numerous tests . . . and then he did several follow-up reviews of Mr. Matthews . . . [and that Dr. Chutkow is] a very competent . . . very strong psychiatrist. And he testified to what he believed was accurate and true to the best of his knowledge." (*Id*. at 3851, Busse Dep.) Busse also explained that notwithstanding critiques of Dr. Chutkow's examination two decades after the fact, not only did "Dr. Chutkow [do] a thorough and complete exam," (*id*. at 3884), but Petitioner's defense team were limited in their options for experts in Petitioner's trial because "in 1981, psychiatrists were not signing up all over Jefferson County[, Kentucky] to testify in death penalty cases." (*Id*. at 3919.)

Petitioner's contentions that his trial counsel were ineffective in choosing Dr. Chutkow to evaluate him and testify at trial, and that Dr. Chutkow's clinical methodology was legally insufficient, are unavailing. We have stated that "[c]ounsel's diligence in obtaining not just the constitutionally mandated single mental health expert,

but two mental health experts," as did counsel in this case, "shows that counsel engaged in a reasonable investigation into Petitioner's mental state at the time of the crimes." *Lundgren*, 440 F.3d at 772.

Furthermore, "[t]o the extent that Petitioner's argument can be framed as one impugning the competency of the [psychiatrist] retained to assist trial counsel, Petitioner's argument has little merit." *Id*. We explained in *Lundgren* that "[t]he Constitution does not require that an indigent criminal defendant be able to retain the expert of his choosing, only that a competent expert be made available," and that "[a] licensed practitioner is generally held to be competent, unless counsel has good reason to believe to the contrary." *Id*. Therefore, because there is no evidence in the record challenging Dr. Chutkow's competence and credentials, Petitioner's argument that counsel's choice and preparation of Dr. Chutkow were ineffective, fails.

#### b.      Mitigation Investigation and Presentation

Petitioner also argues that his trial counsel were ineffective for failing to investigate, discover and present a variety of mitigating facts relating to Petitioner's and his family's histories, to wit, evidence of mental illness in Petitioner's family; prevalence of alcoholism in Petitioner's family; Petitioner's own alcohol and drug abuse; and a vast amount of non-statutory mitigating evidence relevant to Petitioner's upbringing and character.

To evaluate whether counsel's investigation was deficient, we compare the "net effect of the undiscovered and unpresented evidence, viewed cumulatively," *Morales v. Mitchell*, 507 F.3d 916, 936 (6th Cir. 2007), with the "evidence trial counsel [discovered and] presented on Petitioner's behalf." *Haliym*, 492 F.3d at 708.

#### i.      Omitted Evidence

To demonstrate that his trial counsel were ineffective for failing to sufficiently investigate and present mitigation evidence, Petitioner presents affidavits from several individuals personally acquainted with him, and his life prior to the crimes. The affiants include: Rita Baete, Petitioner's first cousin; Beverly Higdon, Petitioner's younger sister;

Barbara Kaegin, Laverne Matthews' friend, and Petitioner's childhood babysitter; Jerry Matthews, Petitioner's brother; Linda Matthews, Jerry Matthews' wife, and Petitioner's sister-in-law; Anna Rose Seward, Laverne's sister, and Petitioner's aunt; Brenda Mattingly, Petitioner's first cousin; Anthony Wayne Matthews, Petitioner's son; Judy Kay Carrier, Petitioner's girlfriend from the fall of 1974 through the summer of 1975, and the mother of one of Petitioner's children; and Laverne Matthews. The affiants each averred facts regarding the categories of mitigating evidence that Petitioner contends his trial counsel failed to discover and present at the trial's penalty phase. Many of the affiants also testified, and were cross-examined, at an evidentiary hearing regarding Petitioner's habeas petition held before the magistrate judge. (*See* App. at 3334-809, Evidentiary Hr'g 7/7/2000.)

Several individuals who affirmed that they would have been willing to testify at Petitioner's trial, provided evidence regarding the history of mental illness in Petitioner's family. Rita Baete explained that her mother, Petitioner's maternal aunt, "was severely mentally ill for many years," that her "mother heard voices," experienced delusions, and "was hospitalized many times over the years because of her mental illness." (*Id*. at 3941, Baete Aff.) Furthermore, Beate indicated that she perceived "personality traits in other family members . . . similar to [those of her mother] . . . . Specifically, . . . Margaret Laverne Matthews, Anna Rose Seward . . . Roger Wayne Matthews and Beverly Matthews Higdon act[ed] at times like [her] mother did. [And that m]any people in [the] family ha[d] 'short fuses,' and experience[d] serious episodic mood swings." (*Id.*)

Beverly Higdon also detailed the history of mental illness in Petitioner's family. Specifically, she listed the following incidents: (1) "maternal uncle, William Beard committed suicide;" (2) "Grandfather Beard's sister committed suicide;" (3) "Timothy Ray Matthews, [Petitioner's] son committed suicide at the age of seventeen;" (4) "maternal aunt . . . was hospitalized and treated for mental illness;" and (5) she "was hospitalized in 1980 at Our Lady of Peace Hospital and treated for Depressive Neurosis as well as habitual excessive drinking." (*Id*. at 3946, Higdon Aff.)

Petitioner's brother, Jerry Matthews, also averred that he thought "[his] brother Roger Wayne ha[d] mental problems," and that "Wayne [wa]s a strange person. He d[id] not know how to have a relationship with anyone." (*Id.* at 3980, Jerry Matthews Aff.) Further, Jerry Matthews stated that "[he] believe[d] that [his] mother ha[d] mental problems." (*Id.* at 3981.) Finally, Petitioner's aunt, Anna Rose Seward, stated that she "believe[d] that depression runs in her family." (*Id.* at 3988, Seward Aff.)

Petitioner also contends that the affidavits illuminate that alcoholism was prevalent in his family, and that his trial counsel failed to uncover these readily-available mitigating facts, thereby preventing the jury from learning about this significant mitigating fact to his detriment. Regarding Petitioner's family's alcoholism, Baete stated that "Margaret Laverne [Matthews] was an alcoholic. [That Baete's] mother . . . told her before she died that Laverne had drunk (sic.) alcohol when she was pregnant with her children." (*Id.* at 3942-43, Baete Aff.) Baete further averred that "[w]henever Laverne came to visit . . . she brought her beer for herself to drink . . . . [Baete] remember[ed] seeing Laverne and [her boyfriend] Lenny together, staggering down a public street, drunk . . . . [Baete's] own father used to drink, and when he was drunk he would get violent." (*Id.* at 3943-44.)

Moreover, Petitioner's sister, Beverly Higdon summarized her family's history of alcoholism as follows: (1) "[her] father, Ernest Matthews went from corner to corner patronizing bars;" (2) "[her] mother Laverne Matthews was an alcoholic;" (3) "Grandfather Beard drank daily;" (4) "[her] brothers Wayne, Jerry and David drank frequently;" (5) "[her] maternal uncle, William Beard was an alcoholic;" (6) "[she] was hospitalized at Our Lady of Peace in 1980 for treatment for alcoholism." (*Id.* at 3945-46, Higdon Aff.) Barbara Kaegin also maintained that "Laverne Matthews, David Matthews' mother drank all the time." (*Id.* at 3977, Kaegin Aff.)

Jerry Matthews also discussed the prevalence of alcoholism in his family. He stated that Laverne, his mother, "was a binge drinker . . . . Sometimes [Laverne] would use the rent money for alcohol and [his] Grandmother would have to pay the rent. [Over time, Laverne's] drinking spells got progressively longer," and eventually they were

forced to "move[] to [his] Grandma Beard's house because of Laverne's drinking." (*Id*. at 3979, Jerry Matthews Aff.)  Jerry Matthews' wife Linda further reinforced that "Laverne Matthews drank.  Mainly binge drinking." (*Id*. at 3983, Linda Matthews Aff.) Laverne's sister, Anna Rose Seward, also stated that "[w]hile [her children] were away at school during the day, Laverne would drink beer all day long. [Laverne] also drank heavily with her paramour Lenny." (*Id*. at 3984, Seward Aff.)

Petitioner further argues that his trial attorneys failed to discover and present details of his own alcohol and drug abuse.  On this issue, Rita Baete stated that she "remember[ed] seeing David Matthews drinking alcohol from around the time he was fifteen or sixteen years old.  [She] wasn't around him a lot, but when [she] did see him, he would be drunk." (*Id*. at 3943, Baete Aff.)  Similarly, Barbara Kaegin stated that "[d]uring the year or two before the murders, David Matthews drank all of the time. David Matthews always had a beer in his hand . . . . David Matthews never drank on the barge when he worked but would take up drinking as soon as he got home from one of the trips." (*Id*. at 3977, Kaegin Aff.)  Furthermore, Kaegin recounted that "on one occasion [Petitioner] tried to obtain Valium from her." (*Id*.)

Petitioner's brother, Jerry Matthews, also discussed Petitioner's drinking and drug use in his affidavit. Jerry Matthews observed that after Petitioner's debilitating arm injury, Petitioner "became a 'rouser' doing a lot of drinking . . . [and] became accustomed to taking drugs due to the many pain medications he was taking after his injury." (*Id*. at 3980, Jerry Matthews Aff.)  Jerry Matthews elaborated that "[Petitioner's] drinking became more severe after his divorce from his first wife." (*Id*. at 3981.)

Judy Kay Carrier, Petitioner's ex-girlfriend, further attested that "[Petitioner] drank alcohol a lot.  He would wake up in the morning with a beer bottle in his hand, and drink all day . . . he would drink until he passed out." (*Id*. at 3996, Carrier Aff.) Carrier further stated that she "saw [Petitioner] take pills when [they] were together. [However, she] didn't know what kind of pills they were." (*Id*.)

Finally, the affiants discussed Petitioner's upbringing and character in some detail. Rita Baete provided information regarding Petitioner's childhood. She stated that Petitioner's "[g]randma acted like a mother to [Petitioner and his siblings as children] because Laverne could not. At times, the Matthews kids were pounded with a lot of verbal abuse . . . . [And, she] never saw anyone hug the Matthews kids." (*Id*. 3942, Baete Aff.) Baete also explained that "[Petitioner's] father, Ernest, was never, ever in the family home or considered part of the family." (*Id*. at 3943.) However, Baete stated that in spite of the adversity, "[she] remember[ed] David Matthews to have been a good boy. When Grandma Beard was dying . . . [Petitioner] would come over with big hugs for Grandma Beard. He would sit beside her and hold her hand. He would make her feel she was loved." (*Id*.)

Beverly Higdon recounted aspects of Petitioner's childhood. She stated that she and Petitioner "didn't have a happy family at home." (*Id*. at 3946, Higdon Aff.) Her "family lived in the Park Hill Projects," and "[her] father Ernest Matthews deserted the family when [she] was an infant and [Petitioner] was about 22 months old." (*Id*. at 3945.) Jerry Matthews further elaborated on these same subjects, stating, "[his] parents got divorced . . . [and his] father, Ernest Matthews, was not allowed to see his children." (*Id*. at 3979, Jerry Matthews Aff.) Over an approximately five year period during his and Petitioner's childhood, "[Laverne] would be absent for the home for quite a few hours; leaving the children by themselves. [Laverne] would be out drinking." (*Id*.)

Jerry Matthews also discussed Petitioner's arm injury's effect on Petitioner's personality:

> [Petitioner's] personality changed a great deal after a severe arm injury in 1968. His right arm was shorter than his left arm and the use of the arm was limited. Before the injury, [Petitioner] was a family man. [Petitioner] was a hard worker. He could take an old house in the west end, one sadly in need of repairs, and you wouldn't know it was the same house in a month or two. After the accident, he had to take whatever work he could get.

(*Id*. at 3980.)

Linda Matthews' affidavit included statements praising Petitioner's character. She stated that "David Matthews could be the most likable, sweetest person. He was great with [her] kids. [Petitioner] was playful with the kids, picking them up and showing them attention. It was very shocking to [her] when [she] heard of his crimes." (*Id*. at 3983, Linda Matthews Aff.)

Laverne's sister, Anna Rose Seward, discussed her encounters with Petitioner as a child. "All the Matthews kids would come over and visit [her], [her] husband and [their] kids . . . . [Petitioner] always helped with work around the house when he stayed over." (*Id*. at 3987, Seward Aff.) Seward further stated that "Ernie Matthews, [Petitioner's] father, was never in the picture as the children were growing up." (*Id*.) Nor, did "[t]he Matthews children . . . receive consistent discipline or attention from Laverne. As a matter of fact . . . [Laverne] left the disciplining of her children to her other children." (*Id*.) Finally, Seward discussed Petitioner's character, stating, "[Petitioner] was a hard worker. [She] always remember[ed] him to have worked. He was reliable also. When he borrowed money from [her] to take on the barges (where he worked), he would always pay the money back as soon as he could." (*Id*.)

Brenda Mattingly described her recollection of Petitioner's childhood as follows: "[she] never saw Laverne hug or kiss her kids. She did not provide discipline or attention . . . . She would encourage her older kids to physically discipline the younger ones . . . . In [Petitioner's childhood home,] there was no stability." (*Id*. 3989, Mattingly Aff.) However, Mattingly stated that "[d]espite the way [Petitioner] was raised, [she] saw him treat his own kids [well] . . . . He respected and loved his kids, and he never mistreated them. [She] ha[d] seen him feed and bathe his kids, and play with them. He gave them a lot of attention when he wasn't working." (*Id*. at 3990.) Finally, Mattingly expressed that "[a]s an adult, [she] remember[ed Petitioner] as a very hard worker. He was never one to just sit around." (*Id*.)

Anthony Wayne Matthews, Petitioner's son, also discussed his father's character in his affidavit. He stated, "[Petitioner] has always been very affectionate with [him], with big hugs. [They] have always had a good relationship." (*Id*. at 3992, Anthony

Wayne Matthews Aff.)  Petitioner's son further explained that "[Petitioner] taught . . . and all of his kids the importance of respecting other people," and that Petitioner "never disciplined [his son] by hitting him."  (*Id.* at 3992-93.)  Finally, Petitioner's son recounted that "[w]hen [he] was growing up, [Petitioner] tried to spend as much time with [him] as he could . . . . At one point after [Anthony Wayne Matthews'] parents were separated, . . . [Petitioner] would drive sixty miles . . . out . . . to spend time with [him] and then sixty miles back."  (*Id.* at 3993.)  "With [Petitioner]," explained Anthony Wayne Matthews, "if it was anything within reason, [Petitioner] would give [his son] whatever [his son] asked for. [Petitioner had] never been selfish."  (*Id.* at 3994.)

### ii.    Discovered Evidence

At trial, Petitioner was represented by a team of two assistant public defenders, David Busse, a member of the bar for six years at the time of trial, and Christopher Rivers, a member of the bar for three years at the time of trial.  To prepare for Petitioner's trial, in addition to interviewing Petitioner on numerous occasions, counsel had Petitioner examined by two experts, a psychiatrist and a neuropsychologist, and interviewed thirty-three individuals, including, among others, Petitioner's family, friends and neighbors: Bernice Brown, Laverne's neighbor; Marion "Smokey" Brown, Laverne's neighbor; Larry Cruse, Marlene's brother, and Magdalene's son; Lawrence Cruse, Marlene's father, and Magdalene's husband; Carol Engel; Beverly Higdon, Petitioner's sister; Sherry McMichael, Larry Cruse's wife; Ray McMichael, Sherry McMichael's father; Laverne; Roger Wayne Matthews, Petitioner's brother; Linda Morgan, Marlene's neighbor; Eddie Peltier, Petitioner's friend; Elaine Peltier, Eddie's wife; Lenny Perry, Laverne's boyfriend; and Murray Turner, Petitioner's family attorney.[6]

Petitioner's defense team inquired into a family history of mental illness as a potential mitigating factor.  In her interview, Beverly Higdon told interviewers that she

---

[6]It is important to bear in mind that while only a handful of individuals' statements are summarized above, Petitioner's counsel interviewed numerous additional individuals, thirty-three in total, who were personally connected to Petitioner, including friends, neighbors, family members and co-workers.  Only the statements containing relevant mitigation evidence are summarized.

"underwent psychiatric treatment concerning the death of one of her own [children]."
(*Id*. at 4123, Higdon Interview Notes.)  The interviewees also discussed the alcoholism
in Petitioner's family.  Laverne, in particular, explained that she had drinking problems
when Petitioner was growing up, stating, "God knows I have drunk in my time," and that
[Petitioner] and Marlene had marital troubles.  (*Id*. at 464, Rep. and Recommendation.)

The interviewees were more forthcoming in their descriptions of Petitioner's drug
and alcohol abuse.  Specifically, Petitioner's long-time friend and "drinking buddy,"
Eddie Peltier, stated that he and Petitioner spent the afternoon and evening before the
shootings drinking at a local park, that Petitioner was a belligerent drunk, and that when
Petitioner "drank he would not stop [drinking] till  he was passed out." (*Id*. at 4135,
Eddie Peltier Interview Notes.)  Carol Engel, recounted that Petitioner acted "different"
the night before the murders, that Petitioner was "hyper or nervous or something."  (*Id*.
at 4118, Engel Interview Notes.)   Engel stated that the evening before the murders, "at
[the] park, [Petitioner] was drinking heavily," that "[she] gave [Petitioner] two
[V]aliums" that evening, and that Petitioner "had a bottle of pills and offered some to
[her]."  (*Id*. at 4117-18.)  Larry Cruse told investigators that Petitioner "drank a case of
beer a day," (*id*. at 4114, Larry Cruse Interview Notes), and Beverly Higdon stated that
at the time, Petitioner "was using pills  . . . to work the doubleshift."  (*Id*. at 4123,
Higdon Interview Notes.)

Smokey Brown, Laverne's next-door neighbor, also discussed Petitioner's
drinking and alcohol use.  He stated that he did not know Petitioner "too well."  But he
stated that the night before the killings he took Petitioner to get some beer, and that
Petitioner took some of Brown's medication that evening.  (*Id*. at 463-44, Rep. and
Recommendation.)

Defense counsel also made inquiries regarding Petitioner's character and
upbringing.  Beverly Higdon described Petitioner's relationship with his estranged
father, and his education.  Higdon also stated that Petitioner "care[d] about [his]
children," and that when "[Petitioner] stayed on her farm and cared for [her] kids and
farm while [she] was away," he did an impeccable job caring for both the children and

the farm. (*Id*.) Laverne described Petitioner's relationship with his estranged father, Ernest Matthews, explaining that although she "divorced [Petitioner's] father [in] 1952 [when Petitioner] was 5 years old [Petitioner was] close to [his] father." (*Id*. at 4123, Laverne Matthews Interview Notes.) Laverne also stated regarding Petitioner's upbringing, that the family spent time living in the "projects," and that Petitioner completed eighth grade when he was fifteen, at which point he "went to work at [the] icehouse." (*Id*.)

The interviewees also discussed Petitioner's relationship with Marlene. Brown stated that he knew that Petitioner worked and had "family problems." Glen Murray Turner, the family attorney, testified regarding the warrants Marlene swore out against Petitioner. He stated that Marlene often swore warrants out against Petitioner, and then bailed him out. (*Id*. at 463-44, Rep. and Recommendation.)

Laverne further discussed Petitioner's domestic difficulties, including the tensions between the Matthews and Cruse families, and their effect on Petitioner. She stated that "Mr. Cruse carried a gun all the time [be]cause he was a security guard . . . [that Petitioner] was totally afraid of him," and that Laverne "had to have her phone [number] changed 3 times because of harassing phone calls from the Cruses' [house]." (*Id*. at 4129, Laverne Matthews Interview Notes.) She further told Petitioner's defense team that Marlene took out warrants against Petitioner, and "on earlier charges by Marlene Marlene had had the family car sold and the money used to post [Petitioner's] bond on Marlene's charge against him." (*Id*.) Moreover, Laverne recounted that "Marlene would take drugs . . . and would spend all [of] her money, so that [Petitioner's] mother would have to buy groceries for the children." (*Id*.) Laverne also stated that Marlene treated Petitioner badly, that at times "Marlene [would be] out on [the] street in front of [the] house [and] would give [Petitioner] dirty looks." (*Id*.) Petitioner's brother, Roger Wayne Matthews, similarly stated that "[Laverne] talked about Marlene's harassing [Petitioner by] constantly walking up and down in [] front of the house, [M]arlene flipping her but[t] at him, lik[e] here it is, you ain't with me, you know 'sexual aggravation.'" (*Id*. at 4132, Roger Wayne Matthews Interview Notes.)

The victims' relatives, Lawrence Cruse, Larry Cruse, Sherry McMichael, and Raymond McMichael, also stated that Petitioner was "crazy" but not insane. (*Id*. at 463-44, Rep. and Recommendation.)

In their depositions, Petitioner's trial counsel further reinforced that contrary to Petitioner's assertion in his habeas petition, his defense team discovered and utilized a substantial amount of the information at issue. Mr. Busse, one of Petitioner's trial counsel, stated that "[much] of these affidavits [presented in support of Petitioner's habeas petition were] talking about family problems, a history of alcoholism, things that [Dr.] Chutkow already knew." (*Id*. at 3876, Busse Dep.) Busse further stated that "[m]uch of that family history . . . came into the trial anyway . . . the problems with the mother, the problems with the [] wife," (*id*.), as did the fact that "the victim had previously sworn out warrants and dropped them against Mr. Matthews," and "his drinking history." (*Id*. at 3901.)

### iii.     Analysis

Petitioner argues that "Matthews' lawyers or investigators contacted almost thirty people, but they unreasonably curtailed their mitigation investigation." (Br. of Pet'r at 23.)

"Counsel's constitutional duty to investigate a defendant's background in preparation for the sentencing phase of a capital trial is well[ ]established." *Harries*, 417 F.3d at 637. The Supreme Court has stated that "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91.

In assessing whether counsel unreasonably curtailed their mitigation investigation this Court has held that:

> counsel's failure to make a reasonable investigation of a defendant's psychiatric history and family background, and to present mitigating evidence to the jury at sentencing, can constitute ineffective assistance. In assessing whether a defendant's counsel was ineffective at the mitigation hearing for failing to introduce certain evidence, the focus

> must be on whether the investigation supporting counsel's decision not to introduce mitigating evidence of the defendant's background was itself reasonable.

*Clark v. Mitchell*, 425 F.3d 270, 284 (6th Cir. 2005) (citing *Wiggins*, 539 U.S. at 522-23, 527).

Even in the unique context of mitigation, "[a]n attorney is not expected to follow up on every possible avenue of inquiry regardless of how improbable it is that that avenue would lead to useful evidence." *Haliym*, 492 F.3 at 712. "Reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Lundgren*, 440 F.3d at 772-73. "Yet, in examining the investigation that counsel made, a court must not consider only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Haliym*, 492 F.3d at 712 (citing *Wiggins*, 539 U.S. at 527).

Petitioner's trial counsel engaged in a significant amount of preparation for Petitioner's trial. Although trial counsel did not discover all of the details revealed in Petitioner's habeas counsel's investigation, they did interview thirty-three individuals acquainted with Petitioner and his crimes. Moreover, in preparing for trial, they inquired after a broad range of potential mitigation issues, including, Petitioner's relationships with the victims, his familial and social relationships, his alcohol and substance abuse, his upbringing, as well as other significant events in his life. Counsel's investigative efforts disclosed significant information on every one of the categories of their alleged ineffective preparation.

A comparison of the lists of individuals interviewed by Petitioner's defense team with those contacted by Petitioner's habeas counsel reveals that Petitioner's defense team contacted Petitioner's siblings, Beverly Higdon and Jerry Matthews, two of the ten people Petitioner alleges were overlooked, or whose testimony was underdeveloped. Furthermore, Petitioner's defense team considered two additional individuals contacted by Petitioner's habeas counsel. Petitioner's defense team attempted to interview his

brother Jerry Matthews. However, Jerry provided defense investigators with limited information, and indicated that he wanted to "stay out of it." (App. at 463-44, Rep. and Recommendation.) Additionally, while Anthony Wayne Matthews, Petitioner's son, was a competent adult by the time Petitioner's habeas counsel took his affidavits, he was a child at the time of Petitioner's trial. Anthony Wayne Matthews admitted that "[a]t several times they had to remove [him] from the courtroom" during the trial because he "was crying, breaking down." (*Id.* at 3674, Tr. of Hr'g 3/2/2006.) Anthony Wayne Matthews was thus hardly an ideal witness at the time of Petitioner's trial.

The individuals interviewed by Petitioner's defense counsel also addressed each of the mitigation categories that Petitioner alleges his counsel failed to adequately investigate. They discussed Petitioner's drug and alcohol use, his tumultuous relationship with his wife, an arm injury he suffered and its effect on his personality and life, his good reputation within his family as a hard worker, his love for his children, and particular "good deeds" he performed for his sister and her children. (*See id.* at 484, Rep. and Recommendation.)

In assessing the significance of trial counsel's shortcomings, if any, we note that several of the witnesses identified in Petitioner's habeas petition had either refused to participate in the initial trial investigation, or testified during the trial and offered largely cumulative evidence on habeas. We have "reject[ed] a requirement that any later-identified cumulative mitigating evidence must have been introduced in order for counsel to have been effective." *Clark*, 425 F.3d at 286.

We further note that much of the information identified by Petitioner's habeas counsel would have been inadmissible hearsay. Several of the individuals identified by Petitioner's habeas counsel related second-hand information. We note, by way of example only, that Rita Baete admitted that she did not "have any personal knowledge of" the full extent of Laverne's drinking, or that Petitioner's brother, Roger Wayne Matthews, had mental difficulties that resulted his spending time in the stockade while in the army. (*See* App. at 3591-92, Tr. of Hr'g 3/2/2006.) Linda Matthews, Jerry Matthews' wife, discussed that Petitioner "had a lot of money when he came off the

barges and [she] felt like Lavern[e] was taking advantage of that situation." (*Id*. at 3360) However, Linda Matthews did not have personal information regarding whether Petitioner gave his mother money, rather her "knowledge of that [came] through other people." (*Id*.) Similarly, Anna Rose Seward described Laverne's inflammatory statements to Petitioner regarding Marlene's behavior. However, Seward was not present when Laverne made the statements in question, and only heard about the incidents through others. (*See id*. at 3629.)

After comparing the undiscovered and the discovered evidence, we find, as aptly stated by the magistrate judge, that "[a] review of [Petitioner's trial counsel's pretrial preparation] reveals that counsel's investigation was much more thorough than Petitioner portrays in his petition and supplemental brief." (*Id*. at 460, Rep. and Recommendation.) We have found counsel ineffective for investigating significantly less than did Petitioner's counsel. *See, e.g., Carter*, 218 F.3d at 597 ("[D]efense counsel made no investigation into [petitioner's] family, social or psychological background and that the failure to do so constituted representation at a level below an objective standard of reasonableness."); *Hamblin v. Mitchell*, 354 F.3d 482, 490-91 (6th Cir. 2003) ("[Counsel] did not obtain any family or social history nor did he contact any of [petitioner's] family members except . . . the mother of [petitioner's] daughter . . . . Counsel also failed to gather any medical information, including psychological information on [petitioner]."). Therefore, we do not find that Petitioner's counsel's preparation of mitigation evidence fell below "an objective standard of reasonableness."

In light of the information gleaned through their investigation, Petitioner's trial counsel decided that their strategy in both the culpability and penalty phases of trial would be to argue that Petitioner was suffering from extreme emotional disturbance when he killed his wife and mother-in-law. They determined

> at that time . . . that [the] defense in the guilt phase had to be compatible with the defense in the penalty phase. And that was a strategic consideration that the attorneys and Mr. Matthews discussed [in determining their trial strategy] because [they] wanted to try to maintain credibility with the jury; that trust us in the guilt phase and that will carry over in the penalty phase.

(App. at 3840, Busse Dep.)  Therefore, Petitioner's trial counsel decided "to present a defense of extreme emotional disturbance throughout the case with the hope of reducing the murder to manslaughter o[r] if that [was] unsuccessful, with the hope of carrying that through the penalty phase so that the jury would not find the death penalty because of the extreme emotional disturbance; that being, [Petitioner's] principal mitigating factor." (*Id.* at 3853.)

To that end, Petitioner's trial counsel maintained that they would have declined to present information at trial that in their estimation would have interfered with the viability of Petitioner's EED defense.  For example, during his deposition, Busse, one of Petitioner's trial attorneys, was asked whether "there [was] anything in what [Anna Rose Seward] ha[d] to offer in her affidavit that's inconsistent with the defense of EED . . . or with any of the evidence that was presented in the penalty phase."  (*Id.* at 3877.) Busse replied that Seward was

> presenting some of the family history, and that can be useful or that can backfire.  For instance, there's a statement [in her affidavit] that says, "the Matthews children, including [Petitioner], did not receive discipline or attention from their mother."  If you stand accused of a double murder telling a jury that it [is] somehow connected to the fact that the mother didn't have proper discipline . . . I can't say whether . . . that kind of thing would be beneficial or detrimental.  It's a trial strategy.

(*Id.*)  Therefore, Petitioner's trial counsel determined that the EED defense would be the most effective defense, and pursued and presented information tending to demonstrate that Petitioner was operating under the influence of EED.

We do not hesitate to find counsel ineffective for failing to adequately investigate mitigation evidence.  *See Harries*, 417 F.3d at 637.  We "will not, however, second-guess the strategic choices of trial counsel if," as here, "they were made after a thorough investigation."  *Haliym*, 492 F.3d at 711.  Where counsel performed an adequate mitigation investigation, we accord counsel's strategic trial decisions "a heavy measure of deference."  *Id.* at 712.  "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."  *Id.* at 711 (quoting *Strickland*, 466 U.S. at 690).

In this case, after assessing the information they gleaned through their adequate mitigation investigation, Petitioner's counsel decided that arguing that Petitioner suffered from EED at the time he committed the crimes was the best mitigation strategy. Counsel made this strategic trial decision in light of the extensive information that they uncovered in their investigation. We decline to find that counsel performed ineffectively in making these "strategic choices."

Petitioner's trial counsel's representation did not fall below an objective standard of reasonableness in investigating and presenting mitigating evidence for the penalty phase of Petitioner's trial.

> **2. Ineffective Assistance of Trial Counsel for Failure to Object to Prosecutorial Misstatements of EED Law in Culpability and Penalty Phases**

Kentucky's murder statute under which Petitioner was tried stated that a defendant's actions were not murder "if he acted under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be." Ky. Rev. Stat. § 507.020. During Petitioner's trial, the prosecutor stated that to find Petitioner guilty of murder the jury had to "find that he was not acting under the influence of extreme emotional disturbance for which there was a reasonable justification or excuse." (Br. of Pet'r at 45.) Petitioner argues that his trial counsel provided ineffective assistance in failing to object to the prosecutor's formulation of the EED definition.

In adjudicating Petitioner's RCr 11.42 motion for post-conviction review, the Kentucky Supreme Court held that the prosecutor did not misstate Kentucky law. The Kentucky Supreme Court explained that in Petitioner's trial "[t]he prosecutor did not misstate the law, he only observed that there is an objective element to the extreme emotional disturbance standard. The statements made by the prosecutor in closing

argument related to the first prong of the test which is an objective one." (App. at 402, *Matthews v. Commonwealth*, No. 96-SC-805-MR (Nov. 20, 1997).)

We defer to state supreme courts' articulation of their own law. *See Gall II*, 231 F.3d at 303. Therefore, we give great weight to the Kentucky Supreme Court's statement that under Kentucky law, EED had both subjective and objective components. Based on the Kentucky Supreme Court's explication of its EED law in effect at the time of Petitioner's trial, we find that the prosecutor did not misstate the law during Petitioner's trial. Petitioner's counsel were thus not ineffective for failing to object to a proper statement of Kentucky law.

Accordingly, Petitioner's trial counsel were not ineffective for failing to investigate and present further mitigating evidence, or for failing to object to prosecutor's definition of EED under Kentucky law.

## VII.    Exclusion of Additional EED Evidence in Penalty Phase

Petitioner asserts that the Kentucky trial court violated his rights under the Sixth, Eighth, and Fourteenth Amendments when it excluded testimony of six witnesses during the mitigation phase of his trial. Petitioner sought to introduce additional testimony regarding his marital difficulties and the tensions between the Matthews and Cruse families.

We have stated that "[i]n a capital case the sentencer may not be precluded from considering, as a mitigating factor, any aspect of defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lundgren*, 440 F.3d at 766 (quoting *Mills v. Maryland*, 486 U.S. 367, 374 (1988)). Moreover, "[i]t is clear that this rule limits the traditional discretion of state courts to exclude evidence based on state evidentiary rules," *Alley v. Bell*, 307 F.3d 380, 398 (6th Cir. 2002), and requires that state courts making evidentiary decisions in capital cases err on the side of admission.

Nevertheless,

> the Eighth Amendment does not deprive the State of its authority to set reasonable limits upon the evidence a defendant can submit, and to control the manner in which it is submitted. Rather, States are free to structure and shape consideration of mitigating evidence in an effort to achieve a more rational and equitable administration of the death penalty.

*Oregon v. Guzek*, 546 U.S. 517, 526 (2006). Nothing in Supreme Court precedent "limits the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense." *Alley*, 307 F.3d at 399 (quoting *Lockett*, 438 U.S. at 604 n.12).

In discussing the trial court's decision to exclude this mitigation evidence, the Kentucky Supreme Court stated that "[t]his claim of error runs to objections sustained as to certain details of the testimony from [Petitioner's] mother, from a longtime friend, and from a former attorney who had been involved in representing both the [Petitioner] and his wife when various domestic warrants between the two surfaced in court." *Matthews I*, 709 S.W.2d at 419. As a matter of state law, the Kentucky Supreme Court upheld the trial court's exclusion of the evidence due to its irrelevance. "In this case, the trial court permitted extensive presentation of evidence regarding previous domestic difficulties. The instances which are the subject of [Petitioner's] complaint were remote transactions between third parties and the deceased wife. Connection to [Petitioner's] state of mind at the time of the crime was non-existent." *Id*.

Petitioner sought to introduce additional evidence regarding his acrimonious relationship with his victims, as well as evidence relating to Marlene's mistreatment of her previous husband. Under Kentucky law, at the sentencing phase of a capital trial, the jury is permitted to consider the mitigating evidence presented at the sentencing phase, and all of the culpability phase evidence. *See Gall I*, 607 S.W.2d at 111. Petitioner had previously presented significant evidence regarding his immediate and extended domestic disputes in the form of testimony from friends, relatives, and his psychiatrist.

The Constitution does not guarantee a defendant, even a capital defendant, an unfettered license to present additional evidence that might be cumulative, repetitive, or questionably relevant. *See Oregon*, 546 U.S. at 526; *Alley*, 307 F.3d at 399. The Kentucky courts did not err in upholding the trial court's decision, and the district court did not err in refusing to grant Petitioner's habeas corpus petition on this ground.

**VIII.   Kentucky Murder Statute's Failure to Define EED**

The Kentucky murder statute under which Petitioner was tried stated that a person commits murder when,

> with the intent to cause the death of another person, he causes the death of such person or of a third person; except that in any prosecution a person shall not be guilty under this subsection if he acted under the influence of extreme emotional disturbance, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be.

Ky. Rev. Stat. § 507.020(1)(a). As previously indicated, the statute did not define extreme emotional disturbance.

It is true that just months after the Kentucky Supreme Court decided Petitioner's appeal, the Kentucky Supreme Court provided a definition for EED.

> Extreme emotional disturbance may reasonably be defined as follows: Extreme emotional disturbance is a temporary state of mind so enraged, inflamed, or disturbed as to overcome one's judgment, and to cause one to act uncontrollably from the impelling force of the extreme emotional disturbance rather than from evil or malicious purposes. It is not a mental disease in itself, and an enraged, inflamed, or disturbed emotional state does not constitute an extreme emotional disturbance unless there is a reasonable explanation or excuse therefor, the reasonableness is to be determined from the viewpoint of a person in the defendant's situation under circumstances as defendant believed them to be.

*McClellan v. Commonwealth*, 715 S.W.2d 464, 468-69 (Ky. 1986). In defining EED, the Kentucky Supreme Court admitted its error in previously failing to provide a definition for EED.

> To say that we know it when we see it, overlooks the fact that it is not the court but a jury that must make a factual determination of whether a particular defendant acted under the influence of extreme emotional disturbance. Without some standard or definition a jury is left to speculate in a vacuum as to what circumstances might or might not constitute extreme emotional disturbance.

*Id*. at 467.

However, under AEDPA, this Court may only grant a petition for habeas corpus under § 2254 if a conviction "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A mistake of state law is not itself a basis for habeas relief. *See Wilson v. Corcoran*, 562 U.S. __, 131 S. Ct. 13, 16 (2010) (per curiam); *Baze*, 371 F.3d at 322.

In reviewing this ground for habeas relief, the relevant question is whether Kentucky's failure to define EED rendered the statute void for vagueness under the due process clause of the Fourteenth Amendment. Quoting the Supreme Court, this Court has held that an element of a state murder statute "is not unconstitutional if it has some common-sense core of meaning that criminal juries should be capable of understanding." *Carter*, 218 F.3d at 608 (quoting *Tuilaepa v. California*, 512 U.S. 967, 973 (1994)).

Kentucky law at the time of Petitioner's crimes did not require the trial court to instruct the jury regarding the definition of EED, stating, "suffice [it] to say that we know [EED] when we see it." *Edmonds*, 586 S.W.2d at 27. In *Proffitt v. Florida*, 428 U.S. 242, 257 (1976), the Supreme Court upheld the constitutionality of an undefined EED instruction. The Supreme Court maintained that "[w]hile . . . questions and decisions" regarding whether a defendant was suffering from EED "may be hard, they require no more line[]drawing than is commonly required of a factfinder in a lawsuit." *Id*. Therefore, although the undefined EED element under which Petitioner was tried could have been clearer, and may have been error under Kentucky law, it does not

appear that the Supreme Court would consider it so egregiously vague as to violate due process.

## IX.        Ineffective Assistance of Appellate Counsel

The Sixth Amendment guarantees appellate counsel to a criminal defendant. *Haliym*, 492 F.3d at 694 (quoting *Evitts v. Lucey*, 469 U.S. 387, 396 (1985)).  As is the case when evaluating a claim of ineffective assistance of trial counsel, "[i]n considering whether the assistance of [appellate] counsel was constitutionally ineffective, [this Court] applie[s] the . . . standard of *Strickland v. Washington*."  *Id.*

In *Strickland*, the Supreme Court stated that "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."  *Strickland*, 466 U.S. at 686.  Thus, to prevail on an ineffective assistance of appellate counsel claim, a petitioner "must demonstrate that counsel's representation fell below an objective standard of reasonableness and that the [petitioner] was prejudiced by the ineffective assistance of counsel."  *Carter*, 218 F.3d at 591 (citing *Strickland,* 466 U.S. at 687).  "Representation is deficient," failing the first prong of the *Strickland* test, "when counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment."  *Id.*  To satisfy the second, prejudice prong of *Strickland*, a petitioner "need not show that counsel's deficient conduct more likely than not altered the outcome in the case, rather, only that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Lundgren*, 440 F.3d at 770 (citing *Strickland*, 466 U.S. at 494).  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id*. at 799.

To provide guidance regarding *Strickland*'s application to claims of ineffective assistance of appellate counsel, this Court has enumerated several

> considerations that ought to be taken into account in determining whether an attorney on direct appeal performed reasonably competently.  (1) Were the omitted issues significant and obvious?; (2) Was there arguably

contrary authority on the omitted issues?; (3) Were the omitted issues clearly stronger than those presented?; (4) Were the omitted issues objected to at trial?; (5) Were the trial court's rulings subject to deference on appeal?; (6) Did appellate counsel testify in a collateral proceeding as to his appeal strategy and, if so, were the justifications reasonable?; (7) What was appellate counsel's level of experience and expertise?; (8) Did the petitioner and appellate counsel meet and go over possible issues?; (9) Is there evidence that counsel reviewed all the facts?; (10) Were the omitted issues dealt with in other assignments of error?; (11) Was the decision to omit an issue an unreasonable one which only an incompetent attorney would adopt?

*Mapes v. Coyle*, 171 F.3d 408, 427-28 (6th Cir. 1999).

We have explained that "in reviewing a lawyer's performance, a court's scrutiny must be highly deferential." *Caver v. Straub*, 349 F.3d 340, 348 (6th Cir. 2003) (quoting *Strickland*, 466 U.S. at 689). Assessing appellate counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* (same). Nor does "the *Strickland* performance standard . . . require an attorney to raise every non-frivolous issue on appeal. Indeed, the process of winnowing out weaker arguments on appeal and focusing on those more likely to prevail is the hallmark of effective appellate advocacy." *Id.* (quoting *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983)). Therefore, "it is difficult to demonstrate that an appellate attorney has violated the performance prong where the attorney presents one argument on appeal rather than another. In such cases, the petitioner must demonstrate that the issue not presented was clearly stronger than issues that counsel did present." *Id.* (quoting *Smith v. Robbins*, 528 U.S. 259, 289 (2002)).

Petitioner argues, based on the *Mapes* factors, that his appellate counsel were constitutionally ineffective for failing to argue for a change in Kentucky law defining EED before the Kentucky Supreme Court. Petitioner identifies two pieces of information to support his contention that the omitted argument was "significant and obvious," and more compelling than the arguments raised. First, Petitioner points to the fact that at least six briefs to the Kentucky Supreme Court raised the issue between 1981

and 1986, while Petitioner's direct appeal was pending.  Second, Petitioner points out that less than a year after Petitioner's direct appeal concluded, the Kentucky Supreme Court overruled prior Kentucky law, and defined EED in the *McClellan* case.  Petitioner argues that the proximity of *McClellan* to Petitioner's appeal demonstrates that the Kentucky Supreme Court was primed to overrule its prior precedent at the time it heard Petitioner's appeal.

Petitioner also states that trial counsel objected to the court's failure to define EED, and that as a pure question of law it would not have been subject to deference on appeal.  Petitioner further points to appellate counsel's testimony to the magistrate judge that their failure to raise the argument was an oversight rather than a strategic decision.  Finally, Petitioner notes that of his three appellate attorneys, only one had ever been involved in a capital appeal, and none had more than six years of legal experience.  (*See* App. at 519-22, Rep. and Recommendation.)

Many of the *Mapes* factors suggest that Petitioner's appellate counsel were ineffective.  However, in enumerating these factors, we have admonished that "[m]anifestly, this list is not exhaustive, and neither must it produce a correct score; we offer these inquiries merely as matters to be considered." *Mapes*, 171 F.3d at 428.  With the benefit of hindsight, it seems that the omitted challenge to Kentucky's failure to define EED may have carried the day in Petitioner's direct appeal in the Kentucky Supreme Court.  However, in 1985, when Petitioner's case was decided by the Kentucky Supreme Court, this conclusion was far from clear.  At that time, the Kentucky Supreme Court's statement that it was "unnecessary to define extreme emotional disturbance.  We know it when we see it," *Edmonds*, 586 S.W.2d at 27, was settled law.  Moreover, that six briefs to the Kentucky Supreme Court raised the argument highlights the fact that in the years preceding Petitioner's appeal, the Kentucky Supreme Court declined to overrule itself on several occassions, suggesting that a challenge to Kentucky EED law was not obviously a winning argument.

We conclude that Petitioner's appellate counsel did not provide ineffective assistance by failing to argue that the Kentucky Supreme Court change Kentucky law to provide a definition of EED.

## CONCLUSION

For the foregoing reasons, we **REVERSE** the decision of the district court, and **GRANT** Petitioner's petition for a writ of habeas corpus based on the Kentucky courts' violation of Petitioner's due process rights by impermissibly shifting onto Petitioner the burden of proof with respect to extreme emotional distress, where proof of the absence of extreme emotional distress was an element of murder under Kentucky law, and the state failed to prove this element.

We also **REVERSE** the decision of the district court, and **GRANT** Petitioner's petition for a writ of habeas corpus based on flagrant prosecutorial misconduct at Petitioner's trial, which interfered with Petitioner's due process rights.

We **AFFIRM** the decision of the district court, and **DENY** Petitioner's petition for a writ of habeas corpus based on ineffective assistance of trial and appellate counsel, the Kentucky courts' failure to define extreme emotional distress, the Kentucky trial court's exclusion of additional extreme emotional distress evidence during the trial's penalty phase, and the Kentucky murder statute's purported vagueness.

The State of Kentucky is hereby ordered to release Petitioner from custody unless a new trial consistent with this opinion is commenced within 180 days. We leave it to the State of Kentucky to determine in the first instance whether and to what extent any retrial is consistent with the double jeopardy clause and state law.

---

**CONCURRING IN PART AND DISSENTING IN PART**

---

SILER, Circuit Judge, concurring in part and dissenting in part. I would affirm the district court's judgment denying the petition for a writ of habeas corpus. Therefore, I dissent on Parts IV and V of the majority opinion. In all other respects, I concur in the conclusions of the majority opinion, except where it authorizes the issuance of a writ of habeas corpus. This concurrence/dissent will only discuss those portions of the majority opinion with which I disagree, to wit, the sufficiency of the evidence and prosecutorial misconduct.

### I.     Shifting the Burden of Proof on EED

David Eugene Matthews asserts that he was denied due process of law under the Fourteenth Amendment because the decision by the Kentucky Supreme Court in *Matthews v. Commonwealth*, 709 S.W.2d 414, 420-421 (Ky. 1985), "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Put another way, he asserts that the evidence was insufficient to convict him of murder because "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970).

The certificate of appealability does not include a claim that the instructions to the jury were erroneous. Therefore, we must look to see if the Supreme Court of Kentucky failed to follow the criteria in 28 U.S.C. § 2254. The Kentucky Supreme Court did not shift the burden of proof to the defendant under the EED defense. Although it cited the case of *Wellman v. Commonwealth*, 694 S.W.2d 696 (Ky. 1985), it went on to say that the "trial court's instructions in regard to extreme emotional disturbance were adequate, and the proof supported the jury's findings of intentional murder." *Matthews*, 709 S.W.2d at 421. It did not apply *Wellman* to Matthews's case, because it assumed that the prosecution bore the burden of proving absence of EED once

Matthews produced some evidence of EED. Unlike the decision in *Gall v. Commonwealth*, 607 S.W.2d 97 (Ky. 1980) (*Gall I*), it addressed the sufficiency of the evidence claim "head-on," and the proof at trial was sufficient to show the absence of EED beyond a reasonable doubt.

The majority is correct in its conclusion that EED was only an element of murder if the defendant raised a reasonable doubt as to its presence. It further concludes that Matthews had the initial burden of production to show EED. Matthews met that burden, but the Kentucky Supreme Court did not shift the burden of proof to the defendant and its opinion did not say it did. Moreover, the murder instructions, Numbers 3 and 7 in this case, clearly show that the burden of proof had never shifted to Matthews. They read as follows:

> You will find the defendant, David Eugene Matthews, guilty under this instruction if, and only if, you believe from the evidence beyond a reasonable doubt, all of the following:
>
> (a) That in this county on or about the 29th day of June, 1981, he shot [the victims] with a pistol which resulted in [their] death[s]; AND
>
> (b) That in so doing he caused [the victims' deaths] intentionally and not while acting under the influence of extreme emotional disturbance for which there was a reasonable justification or excuse under the circumstances as he believed them to be.

The remainder of the instructions included finding the defendant not guilty unless the jury was satisfied beyond a reasonable doubt he was guilty. There was no jury instruction which required Matthews to have either the burden of production or of proof.

Although Matthews claims that the prosecution produced no evidence to contradict his threshold showing of EED in his case, the Supreme Court of Kentucky found that the prosecution had rebutted the evidence of EED sufficiently to present the issue to the jury. It recited the facts that "[i]n addition to the circumstances of the crime, the proof was that when he returned to his mother's house after the crime, . . . he took steps to hide the gun and clean his clothes. Shortly thereafter, he gave a false statement to the police." *Matthews*, 709 S.W.2d at 421.

Obviously, we must follow the decision in *Gall v. Parker*, 231 F.3d 265 (6th Cir. 2000) (*Gall II*), if it is applicable. However, we stated in *Gall II* that the Commonwealth did "not even claim to have" rebutted the showing of EED in the brief it filed in this court. *Id.* at 291. The majority opinion here holds that the Kentucky Supreme Court should have followed *Gall I* in the direct appeal. The Kentucky Supreme Court did cite *Gall I* for its authority that the Commonwealth did not have to produce direct evidence to show an absence of EED. *Matthews*, 709 S.W.2d at 421. The majority here admits that the Commonwealth did not have to produce direct evidence to sustain its burden of proof on the absence of EED. Moreover, in his brief before this court, Matthews argues that the Kentucky Supreme Court "clearly applied *Gall I*." His argument appears to be that he was saddled with the alleged unconstitutional burden of production for EED evidence announced in *Gall I*.

The law in Kentucky was that when a party raised a defense such as EED, the Commonwealth was not required to rebut it with an expert witness, but could rebut evidence of EED through cross-examination of the expert witness and through all of the circumstances of the crime. *See*, *e.g.*, *Hayes v. Commonwealth*, 625 S.W.2d 583, 585-86 (Ky. 1981) (finding the cross- examination of the expert sufficiently raised factual issues as to whether the defendant acted under EED); *see also Ice v. Commonwealth*, 667 S.W.2d 671, 678 (Ky. 1984) (finding lay testimony used to rebut an expert's testimony as to sanity was sufficient); *Newsome v. Commonwealth*, 366 S.W.2d 174, 177 (Ky. 1963) (finding insanity to be an issue of fact to be determined by the jury even though the accused introduced evidence of insanity). This rule is similar to that in other states. *See*, *e.g., State v. Coe*, 233 S.W.3d 241, 251 (Mo. Ct. App. 2007) ("When the state has the burden of proving a negative fact, . . . it may be proven by circumstantial evidence."); *State v. Gonzalez-Rivera*, 713 A.2d 847, 853 (Conn. App. Ct. 1988) (affirming court's rejection of the affirmative defense of EED where the prosecution rebutted expert testimony with only circumstantial evidence of events surrounding the crime).

The majority asserts that these cases shed little light on whether the prosecution carried its burden on EED in this case. Admittedly, some of these cases involve an affirmative defense under which the accused bears the burden of persuasion, but, as the majority agrees, the burden of production was upon Matthews and he produced his expert witness. As the district court found:

> What is required is that at the conclusion of the evidence, a reasonable jury be able to find beyond a reasonable doubt the absence of EED. . . . Substantial evidence in this case allowed reasonable jurors to do so.

*Matthews v. Simpson*, 603 F. Supp. 2d 960, 972 (W.D.Ky. 2009).

In *Gall II*, we held that there was insufficient evidence to sustain the conviction. 231 F.3d at 288. The evidence in this case was much different from the evidence produced in *Gall.* For instance, Gall introduced the testimony of two experts that he suffered from a severe psychotic disorder, specifically chronic paranoid schizophrenia. Against that, the Commonwealth admitted it had not rebutted the evidence of EED. *Id.* at 291. In Matthews's case, he had one expert who testified that Matthews was suffering from an adjustment disorder, "causing temporary impairment of judgment, poor self-control and diminished awareness." *Matthews*, 709 S.W.2d at 417. The psychiatrist did not find that Matthews suffered from a psychosis. In addition, the Commonwealth rebutted the EED evidence not only by the cross-examination of the psychiatrist, but also by all of the circumstances of the homicide as outlined in *Matthews*. The cumulative effect of the evidence demonstrates that the trial court did not err when it denied the motion for a directed verdict of acquittal and allowed the jury to decide the EED issue under the instructions, which did not shift the burden of proof to Matthews. That procedure was not contrary to Kentucky law at the time nor was it contrary to any Supreme Court case.[1]

---

[1]The Supreme Court has previously chastised us in another habeas corpus case by saying: "We have repeatedly held that a state court's interpretation of state law, . . binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005).

**II.    Prosecutorial Misconduct**

The majority finds that the closing argument by the prosecutor in the guilt phase of the trial denied Matthews his due process rights and thus was in violation of the Constitution.

First, we should determine the standard of review. Although the magistrate judge reviewed this claim de novo because the Kentucky Supreme Court specifically did not address the claim, *Matthews*, 603 F. Supp. 2d at 1072, and the district judge adopted that part of the magistrate judge's recommendation, *see id.* at 965, that was erroneous. The Kentucky Supreme Court ruled on that issue in summary fashion when it stated:

> Appellant presents *thirty-seven* (37) separate assignments of error. We have considered all of these issues. In this opinion time and space dictate that we limit to the issues that merit discussion. As to those we do not discuss, we note, for the record, that they have been considered and rejected.

*Matthews*, 709 S.W.2d at 417. Since oral argument in this case, the Supreme Court decided *Harrington v. Richter*, 131 S. Ct. 770, 784-85 (2011), which requires us to accord AEDPA deference to the issues decided by the state courts. Therefore, I agree with the majority on the standard of review of full AEDPA deference.

The majority correctly states the two-step inquiry to determine whether prosecutorial misconduct rises to the level of unconstitutionality, that is, that the conduct must be both improper and flagrant. *Broom v. Mitchell*, 441 F.3d 392, 412 (6th Cir. 2006). If the argument was improper, then we should consider four factors to decide whether "the improper acts were sufficiently flagrant to warrant reversal: (1) whether the evidence against the defendant was strong, (2) whether the conduct of the prosecution tended to mislead the jury or prejudice the defendant, (3) whether the conduct or remarks were isolated or extensive, and (4) whether the remarks were made deliberately or accidently." *Slagle v. Bagley*, 457 F.3d 501, 515-16 (6th Cir. 2006). This constitutional "line drawing" in prosecutorial misconduct cases is necessarily imprecise

and the touchstone of the due process analysis is the fairness of the trial, not the culpability of the prosecutor. *Id.* at 516.

It is arguable that at least a portion of the prosecutor's comments was improper. We condemned language about "the defense of last resort" in *Gall II*, 231 F.3d at 314-15. However, the remarks were not so egregious or flagrant as to warrant reversal of the convictions based on the four relevant factors from *Slagle*. First, the evidence against the defendant was strong, as counsel admitted that Matthews had killed the two victims. The evidence of whether Matthews was under the influence of EED at the time of the offense was not as compelling, but there was evidence that Matthews did not suffer from this impairment at the time of the killings.

Second, any prejudicial effect appears minimal. As the magistrate judge related:

> [V]ery quickly after making these statements the prosecutor backpedaled and stated that he was not trying to imply that either counsel or Dr. Chutkow was unethical or had fabricated testimony. In fact, the prosecutor stated that Dr. Chutkow was telling the jury the truth.

*Matthews*, 603 F. Supp.2d at 1082.

Third, the comments were isolated. Matthews does not cite to any other instance where the prosecutor allegedly denigrated him or his counsel. As for the last element, the magistrate judge held that it was difficult to say whether the prosecutor's remarks were deliberate or accidental. However, he came to the conclusion that "they were most probably unintentional." *Id.* I agree with the magistrate judge's conclusions. Although the last line of defense argument could have been improper, the withdrawal of the remarks by the prosecutor, without any objection by the defense, takes it out of the flagrant category. Like the magistrate judge and district court, I find that the Kentucky Supreme Court's decision denying this claim was a reasonable application of constitutional law.

Therefore, because I believe the Kentucky Supreme Court did not decide this case contrary to or by an unreasonable application of Supreme Court law, I would affirm the decision of the district court in denying the writ of habeas corpus.